**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4723

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

EDWARD MCCAIN,

Defendant - Appellant.

Appeal from the United States District Court for the District of South Carolina, at Charleston. Patrick Michael Duffy, Senior District Judge. (2:09-cr-00296-DCN-2)

Argued: January 31, 2020                          Decided: September 10, 2020

Before KING, DIAZ, and RUSHING, Circuit Judges.

Affirmed by published opinion. Judge Rushing wrote the opinion, in which Judge King and Judge Diaz joined.

**ARGUED:** Cameron Jane Blazer, BLAZER LAW FIRM, Mount Pleasant, South Carolina, for Appellant. Michael Rhett DeHart, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee. **ON BRIEF:** Sherri A. Lydon, United States Attorney, Columbia, South Carolina, Dean H. Secor, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee.

RUSHING, Circuit Judge:

In 2010, Edward McCain received a mandatory sentence of life imprisonment without the possibility of parole for crimes he committed when he was 17. Six years later, McCain moved to vacate his sentence in light of the Supreme Court's intervening decisions in *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016). In those cases, the Supreme Court held that the Eighth Amendment prohibits sentencing schemes that mandate life imprisonment without parole for offenders who committed homicides before the age of 18, that a sentence of life imprisonment without parole is unconstitutional for such an offender unless his crime reflects irreparable corruption, and that these new rules apply retroactively. *See Miller*, 567 U.S. at 479; *Montgomery*, 136 S. Ct. at 734. The district court conducted a thorough resentencing and again sentenced McCain to life imprisonment without parole after concluding that he presents "one of those uncommon cases where sentencing a juvenile to the hardest possible penalty is appropriate." J.A. 260. On appeal, McCain argues that his sentence is procedurally and substantively unreasonable and that the district court plainly erred by not *sua sponte* vacating his murder conviction. We affirm.

I.

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Over the past fifteen years, the Supreme Court has determined that applying certain punitive measures to juvenile offenders—that is, persons under the age of 18 at the time they committed their crimes—violates the Eighth

2

Amendment's prohibition on cruel and unusual punishments. In *Roper v. Simmons*, the Supreme Court held that the Eighth Amendment prohibits capital punishment for juvenile offenders. 543 U.S. 551, 578–579 (2005). In *Graham v. Florida*, the Court concluded that the Eighth Amendment prohibits sentencing juveniles who commit non-homicide offenses to life without parole. 560 U.S. 48, 82 (2010). And in *Miller*, the Supreme Court held that the Eighth Amendment forbids any sentencing scheme that mandates life imprisonment without parole for juvenile homicide offenders. 567 U.S. at 479.

The Court in *Miller* reiterated that "children are constitutionally different from adults for purposes of sentencing," both in terms of culpability and prospects for reform. *Id.* at 471. Juveniles "have a 'lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking." *Id.* (quoting *Roper*, 543 U.S. at 569). They "'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers," because of their "limited 'contro[l] over their own environment'" and inability "to extricate themselves from horrific, crime-producing settings." *Id.* (alterations in original) (quoting *Roper*, 543 U.S. at 569). And "a child's character is not as 'well-formed' as an adult's; his traits are 'less fixed' and his actions [are] less likely to be 'evidence of irretrievabl[e] deprav[ity].'" *Id.* (second and third alterations in original) (quoting *Roper*, 543 U.S. at 570). Mandatory life without parole for a juvenile offender, the Court reasoned, inappropriately precludes consideration of these "hallmark features" of juvenility such as "immaturity, impetuosity, and failure to appreciate risks and consequences." *Id.* at 477. It prevents the sentencing court from "taking into account the family and home environment that surrounds him," "the extent of

3

his participation in the [criminal] conduct and the way familial and peer pressures may have affected him," the ways in which youthful incompetency may have hindered him in dealing with the justice system or assisting his attorneys, and his capacity for rehabilitation. *Id.* at 477–478. In short, "a sentencer misses too much if he treats every child as an adult." *Id.* at 477. The Court therefore concluded that, before sentencing a juvenile to life imprisonment without parole, a sentencing court must take into account the offender's "youth and attendant characteristics," including how those characteristics "counsel against irrevocably sentencing [him] to a lifetime in prison." *Id.* at 480, 483.

A few years later, in *Montgomery*, the Court held that *Miller* announced a new "substantive rule" of constitutional law that applies retroactively on collateral review to "juvenile offenders whose convictions and sentences were final when *Miller* was decided." 136 S. Ct. at 725, 732. The Court clarified that "[a]lthough *Miller* did not foreclose a sentencer's ability to impose life without parole on a juvenile," that sentence is disproportionate "for all but the rarest of children, those whose crimes reflect 'irreparable corruption.'" *Id.* at 726 (quoting *Miller*, 567 U.S. at 479–480). As the Court explained, *Miller*'s substantive holding rendered life without parole an unconstitutional penalty for the class of "juvenile offenders whose crimes reflect the transient immaturity of youth" as opposed to "those whose crimes reflect permanent incorrigibility." *Id.* at 734. And *Miller*'s procedural component requires a sentencer to consider a juvenile offender's "'youth and its attendant characteristics'" to determine whether a particular offender is among "those juveniles who may be sentenced to life without parole" or "those who may not." *Id.* at 735 (quoting *Miller*, 567 U.S. at 465); *see Malvo v. Mathena*, 893 F.3d 265,

4

272 (4th Cir. 2018) (recounting *Miller*'s substantive and procedural components, as clarified in *Montgomery*), *cert. granted*, 139 S. Ct. 1317 (2019), *and cert. dismissed*, 140 S. Ct. 919 (2020); *United States v. Under Seal*, 819 F.3d 715, 719 (4th Cir. 2016) (same).

II.

A.

McCain committed his offenses in 2008, when he was 17 years old. At the time, McCain dealt heroin with Pierre Sanders in Georgetown, South Carolina. On November 14, 2008, Glen Crawford, Jr. and his nephew James Fannin picked up McCain in their car and drove to a park, ostensibly to purchase heroin. McCain and Sanders, however, believed that Crawford and Fannin were cooperating with law enforcement and planned to silence them. At the park, McCain exited the car and spoke briefly with Sanders. McCain then returned to the car and emptied his pistol into Fannin and Crawford. Seeing that at least one victim was still moving, McCain ran to his grandmother's house nearby to search for more bullets. Finding none, he hid the gun, grabbed a knife, and returned to the park to finish the job. But by the time he returned to the park, crowds and police had gathered at the scene. McCain was eventually found lying in a ditch and arrested.

Fannin died from his injuries, which included gunshot wounds in the back of his head and upper back. As for Crawford, the police report stated he suffered two gunshot wounds to his head, two in his left arm, one in his chest, one in his right hand, and one in his back. He survived, but with permanent and disabling injuries.

McCain and Sanders were charged with Fannin's murder and the attempted murder of Crawford. McCain consented to a transfer for criminal prosecution as an adult, *see* 18

5

U.S.C. § 5032, and pleaded guilty to three counts of the indictment: witness tampering by murder in violation of 18 U.S.C. § 1512(a)(1)(C) (Count One); witness tampering by attempted murder in violation of 18 U.S.C. § 1512(a)(1)(C) (Count Two); and using and carrying a firearm during and in furtherance of a drug trafficking crime and a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 924(j) (Count Five).

By that time, McCain had amassed a serious juvenile record, which placed him in criminal history category IV of the Sentencing Guidelines. His run-ins with law enforcement began shortly after McCain turned nine and his mother was hospitalized for inpatient treatment of bipolar disorder. With an absentee father, McCain was shuttled between his mother's and grandmother's homes, and was placed in foster care for a short time, until he was permanently placed in his grandmother's custody at age 16. He was first arrested at age 11 for causing a disturbance at school. At age 12, he was arrested for attempted armed robbery involving a gun. That same year, he was arrested for assault and battery and violating probation. At age 13, he was again arrested for assault and battery, this time for attacking a Hispanic classmate without provocation after telling the boy he hated all Mexicans. He was arrested twice at age 14—once for shoplifting and once for attempted second-degree burglary.

McCain's guilty plea included the opportunity to have the government move for a sentence below the otherwise applicable mandatory statutory minimum based on his cooperation. But McCain lost that opportunity when, before sentencing, he sent letters threatening to kill Crawford, his co-defendant Sanders, and two other individuals, one of whom was a witness in the case. The district court sentenced McCain to a mandatory term

6

of life imprisonment on Count One, a concurrent term of life imprisonment on Count Five, and a concurrent term of 30 years on Count Two. Because the federal government has abolished parole, McCain's life sentences were the equivalent of life without the possibility of parole. *See Under Seal*, 819 F.3d at 719 n.4. We upheld his sentence and conviction on appeal. *United States v. McCain*, 413 Fed. App. 628 (4th Cir. 2011) (per curiam).

Following his conviction, McCain was placed in the custody of the Bureau of Prisons, where he amassed a lengthy record of misconduct. First in Leavenworth, Kansas, McCain was written up for failure to work and insolence. After his transfer to Terre Haute, Indiana, McCain was reported for five fights. When he was 20, McCain stabbed an inmate multiple times with a nine-inch metal weapon sharpened to a point. The inmate suffered eleven puncture wounds to the back, four to the abdomen, and one under the arm, requiring hospitalization. Six months later, McCain chased down an inmate and assaulted him with a shank. In the summer of 2012, when McCain was 21, he struck an inmate in the head and face with his cuffed hands. A month later, he was reported for exchanging closed-fist punches with another inmate. Shortly thereafter, McCain was again censured for fighting; this time, McCain held down an inmate while encouraging others to strike him.

McCain was then sent to the Special Management Unit at a high security prison in Florence, Colorado, where he remained for fifteen months. While there, he was reported for multiple instances of throwing foul-smelling substances at correctional officers, for threatening correctional officers, and for refusing to obey orders. But he also participated in several educational courses while at Florence. He was subsequently moved to a less restrictive environment in Coleman, Florida, where he remained until resentencing.

7

B.

On June 21, 2016, McCain moved, pro se, to vacate his sentence in light of *Miller* and *Montgomery*. *See* 28 U.S.C. § 2255. The Government consented to resentencing. The district court appointed counsel and granted McCain's request for a neuropsychological evaluation by Dr. Howard Buddin.

McCain was transferred to Al Cannon Detention Center in South Carolina to await resentencing. There, McCain had his first serious disciplinary infraction in approximately five years when he sexually assaulted a female inmate in the medical waiting area. He was 26 years old at the time.

The parties submitted extensive resentencing memoranda and materials to the district court, including Dr. Buddin's report, several previous mental health evaluations from McCain's childhood, and reports from McCain's prison disciplinary record. The district court also received a revised presentence report. The court held a three-day resentencing hearing.

At the resentencing hearing, Dr. Buddin testified about his evaluation. Dr. Buddin diagnosed McCain with antisocial personality disorder and agreed with previous evaluators' diagnosis of attention deficit hyperactivity disorder. Dr. Buddin explained that antisocial personality disorder typically is marked by impulsivity, "[f]ailure to conform to lawful or social norms," inability to benefit from repeat arrests, "[f]ailure to plan ahead," and "lack of remorse." J.A. 155–156. He testified that antisocial personality disorder is difficult to treat but that McCain's acknowledgment of his actions and moral responsibility during their interviews "aug[ured] for a more positive prognosis." J.A. 125. In his report,

8

Dr. Buddin concluded that McCain's arrest at age 17 occurred "during a phase when neurological development was still taking place, and in a meaningful way." J.A. 299. He opined that "McCain's behaviors from childhood forward to the point of his arrest in 2008 represent[ed] the confluence of [disadvantaged] environmental and neurological factors." J.A. 300. Thereafter, McCain "spent his entire adulthood in prison, amongst a population that offer[ed] essentially no hope for providing him with any further knowledge or abilities to cope with stressful and difficult situations." J.A. 300. Dr. Buddin acknowledged that one assessment he conducted showed McCain was three times more likely than the average inmate to commit infractions while incarcerated.

McCain asked the district court to impose a term-of-years sentence or, in the alternative, to fashion a "*de facto* parole process," whereby McCain would "be eligible for periodic judicial review of his sentence" and release upon a showing of satisfactory rehabilitation. J.A. 348. The Government argued for a sentence of life imprisonment.

The district court adopted the revised presentence report, which identified McCain's statutory sentencing exposure as up to life for Count One, up to 30 years for Count Two, and up to life for Count Five. McCain's total offense level was 48, with a criminal history category of IV, which resulted in a Guidelines range of life. The district court acknowledged its sentencing obligations, including the 18 U.S.C. § 3553(a) factors and the juvenile-specific considerations required by *Miller*, *Graham*, and *Roper*. It noted that, given *Miller*'s observations and instructions, "appropriate occasions for sentencing juveniles to the harshest possible penalty will be uncommon." J.A. 242.

9

The district court then summarized the parties' arguments. It acknowledged McCain's contentions that his crime was an example of immature loyalty to a friend, his threatening letters after pleading guilty reflected youthful immaturity, his early childhood was "disrupted by the absence of a father and his mother's health problems," and McCain himself suffered from behavioral difficulties. J.A. 243–244. The court also acknowledged McCain's argument that his time thus far in the Bureau of Prisons had been marked by a lack of rehabilitative opportunities. The district court similarly recognized the Government's arguments regarding the seriousness of the offense, McCain's juvenile criminal history, his diagnosis of antisocial personality disorder, and his misconduct in prison. The court also summarized Dr. Buddin's testimony, explaining that it had carefully reviewed his assessment and analysis in its attempt to "go back and sentence [McCain] at age 27 as though he were 17, . . . to evaluate what he was like at that time and what he's like now." J.A. 255.

Ultimately, the district court concluded that it could see "no difference between that juvenile" who pursued and attacked the Hispanic child or who "threw away a benefit of a plea bargain downward departure in order to threaten other people" and the adult who, while awaiting resentencing, pursued and sexually assaulted a female inmate. J.A. 258–259. In the court's view, McCain's incidents of misconduct in prison—which the court found "disturbing" in both number and nature—were a continuation of his juvenile criminal conduct and emblematic of his antisocial personality disorder. J.A. 258–259. As the court explained, McCain's postsentencing behavior as an adult confirmed that his criminal conduct as a 17-year-old was not attributable to "those mitigating factors of

10

youth." J.A. 259. The court concluded that, after considering "every one of the sentencing factors" and "all the directives in *Miller*," it was "not convinced that [McCain's] chronological age and the hallmark features associated with young age played any substantive role in his commission of these crimes. It may have been a contributing factor, but it was not a major one." J.A. 259. Instead, the court "reluctantly" concluded that McCain presented "one of those uncommon cases where sentencing a juvenile to the hardest possible penalty [was] appropriate." J.A. 260. The district court sentenced McCain to life imprisonment on Counts One and Five and to 30 years on Count Two, to run concurrently.

### III.

On appeal, McCain primarily challenges his sentence of life imprisonment and seeks a remand for resentencing. But he also makes a passing challenge to his conviction for witness tampering by murder in violation of Section 1512. Relying on our decision in *United States v. Under Seal*, 819 F.3d 715 (4th Cir. 2016), McCain argues that, because Congress authorized only death and life imprisonment for his Section 1512 conviction, the district court could not constitutionally sentence him for violating that statute and should have vacated his conviction. *See* 18 U.S.C. §§ 1512(a)(1), (a)(3)(A), 1111(b). Because McCain did not raise this argument below, we review only for plain error. To establish plain error, McCain must show (1) "an error was made"; (2) the error was "plain"; and (3) "the error affect[ed] [his] substantial rights." *United States v. Massenburg*, 564 F.3d 337, 342–343 (4th Cir. 2009). An error affects substantial rights if the error was "prejudicial, which means that there must be a reasonable probability that the error affected

11

the outcome." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks omitted). Even if these requirements are satisfied, we will exercise our discretion to correct the error only if it "'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Massenburg*, 564 F.3d at 343 (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

In *Under Seal*, we held that the Government could not transfer the defendant—a juvenile at the time of the alleged offense—for prosecution as an adult for murder in aid of racketeering because the crime carries a mandatory statutory penalty of either death or life imprisonment, neither of which is a constitutional sentence for a juvenile after *Roper* and *Miller*. *See Under Seal*, 819 F.3d at 717–718, 728; 18 U.S.C. § 1959(a)(1); *see also* 18 U.S.C. § 5032 (authorizing transfer from juvenile status for prosecution as an adult). McCain argues that the district court similarly could not resentence him for violating Section 1512 because the statute authorizes only a sentence of death or mandatory life imprisonment.

Even assuming the district court plainly erred in not vacating McCain's Section 1512 conviction, he has not shown that the error affected his substantial rights.[1] McCain received two concurrent life sentences: on Count One for violating Section 1512 and on

---

[1] We therefore need not decide whether the district court's failure to *sua sponte* vacate McCain's Section 1512 conviction was plain error. Notably, in *Under Seal*, we distinguished cases like this one, where a court must determine "how to remedy a mandatory life sentence that was validly imposed at the time, but which was subsequently determined to be unconstitutional," calling it a "fundamentally different inquiry." 819 F.3d at 727; *see also id.* at 728 ("Whatever the appropriate remedies may be for those juvenile offenders who were convicted and sentenced prior to *Miller*, they stand on entirely different ground than the [d]efendant [here].").

12

Count Five for violating Section 924. On Count Five, McCain pleaded guilty to using and carrying a firearm during and in furtherance of a drug trafficking crime and a crime of violence, namely the murder of Fannin, in violation of Sections 924(c)(1)(A)(i) and 924(j). Section 924(j) provides that anyone who uses a firearm to murder another person in the course of violating Section 924(c) shall "be punished by death or by imprisonment for any term of years or for life." 18 U.S.C. § 924(j)(1). That conviction therefore authorized the district court to sentence McCain to a term of years up to life but did not mandate a sentence of life imprisonment. And that conviction alone would have resulted in a Guidelines sentence of life imprisonment. Thus, even without his conviction for violating Section 1512, McCain was legally subject to a nonmandatory life sentence for his Count Five murder offense.[2]

McCain has not identified any evidence that the district court would have sentenced him differently if it had vacated his Count One conviction for witness tampering by murdering Fannin. The court did not consider itself bound by Section 1512 to impose a mandatory life sentence. *See*, *e.g.*, J.A. 219 (reciting the statutory penalty for Count One as "up to life imprisonment"). His Count Five conviction for using a firearm to murder Fannin and Count Two conviction for witness tampering by attempting to murder Crawford

---

[2] In his reply brief on appeal, McCain for the first time suggests that his conviction on Count Five was plain error after the Supreme Court invalidated Section 924(c)(3)(B)'s residual clause in *United States v. Davis*, 139 S. Ct. 2319 (2019). This Court's decision in *United States v. Mathis*, 932 F.3d 242 (4th Cir. 2019), forecloses McCain's argument. In that case, we held that McCain's predicate crime of violence—witness tampering by murder in violation of Section 1512(a)(1)—is categorically a crime of violence under the force clause of Section 924(c)(3)(A). *Mathis*, 932 F.3d at 264–265.

13

brought before the district court the same facts and circumstances as his Count One conviction; vacatur of his Count One conviction would not have excluded material facts or conduct from the district court's consideration.  Indeed, in sentencing McCain, the district court focused on the overall conduct of the crimes, McCain's history, and his postconviction conduct and diagnosis.  McCain has failed to demonstrate a reasonable probability that, but for the assumed error, the district court would have imposed a lesser sentence.  *See United States v. Foster*, 507 F.3d 233, 251–252 (4th Cir. 2007) (finding the district court's error did not affect two defendants' substantial rights where they would have received life sentences even without the district court's error).

III.

McCain contends that his sentence of life imprisonment was procedurally and substantively unreasonable.  We review all sentences for "reasonableness," *United States v. Susi*, 674 F.3d 278, 282 (4th Cir. 2012), applying a "deferential abuse-of-discretion standard," *Gall v. United States*, 552 U.S. 38, 41 (2007).  In conducting that review, we must first "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [Section] 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.* at 51. If the sentence is procedurally sound, we then consider the substantive reasonableness of the sentence, taking into account "the totality of the circumstances." *Id.*  In the context of

14

a juvenile offender, those circumstances include the many ways that "children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at 471.

A.

McCain first argues that his sentence is procedurally unreasonable because the district court failed to sufficiently address McCain's juvenility at the time of the offense and instead focused too heavily on McCain's adult diagnosis of antisocial personality disorder and his postconviction misconduct.

We note at the outset that the district court conducted a thorough multiday sentencing hearing, during which it listened to the testimony of McCain's neuropsychologist and discussed with the parties their various arguments. The court considered the Sentencing Guidelines and properly calculated the Guidelines range, carefully described the parties' contentions as they pertained to each of the Section 3553(a) factors and *Miller* factors, and adequately explained its chosen sentence. *See Gall*, 552 U.S. at 51; *Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."). The district court specifically discussed the evidence concerning McCain's "immaturity and impetuosity" at the time of the offense, his susceptibility to influence, his "family and home environment," his juvenile criminal history, his experience with the criminal justice system and ability to assist his attorneys, his juvenile mental health and behavioral evaluations and interventions, his "relative lack of rehabilitative opportunities" since incarceration, his postconviction conduct, and his recent neuropsychological evaluation. *See* J.A. 243–244,

15

247–253, 255–257. In short, the sentencing hearing easily satisfied our requirements for procedural reasonableness and fulfilled *Miller*'s procedural mandate. *See Montgomery*, 136 S. Ct. at 734–735; *Miller*, 567 U.S. at 483; *Susi*, 674 F.3d at 282; *cf. United States v. Sparks*, 941 F.3d 748, 756 (5th Cir. 2019) (concluding that multiday hearing and lengthy explanation gave the defendant "far more than the minimum procedure necessary to conduct a proper [Section] 3553(a) analysis").

After careful review of the sentencing transcript, we cannot agree with McCain's contention that the district court failed to sufficiently consider his juvenility at the time of the offense. For example, the court specifically acknowledged McCain's arguments that his refusal to implicate his co-defendant Sanders could have been indicative of "immature loyalty to a friend"; that McCain was influenced by Sanders or "felt he could curry favor from" Sanders, who was a mentor figure to him, by targeting Crawford; and that he lost his opportunity for a downward departure by writing threatening letters "to look hard to others" as "a child playing a man's game." J.A. 243–244, 250. Likewise, the court described the Government's arguments that McCain's crimes were "cold and calculated"; that he was a "street smart" heroin dealer and "suffered none of the deficits of a vulnerable juvenile"; that he was not physically abused or living in a "brutal home environment"; that his juvenile criminal history belied any contention that his participation was unwitting or due to juvenile impressionability; and that he was very familiar with the criminal justice system and "able to assist his attorneys." J.A. 247–249. The court took care to consider the implications of McCain's age at the time of the offense but, on the whole, simply disagreed that McCain's youth was a substantial factor in his commission of these crimes. J.A. 259.

16

As for the antisocial personality disorder diagnosis and McCain's postconviction misconduct in the Bureau of Prisons, the district court appropriately considered these in the context of assessing whether McCain's criminal behavior reflected "transient immaturity" or "irreparable corruption." *Miller*, 567 U.S. at 479–480; *see Montgomery*, 136 S. Ct. at 734. From the district court's perspective, McCain's postconviction violent and predatory conduct, which has continued for many years after he reached age 18, indicated that his crimes at age 17 were not the product of the hallmarks of juvenility but of something more permanent, such as the disorder diagnosed by McCain's own expert.

Recent decisions implementing *Miller*'s mandate support the district court's analysis. For example, in *United States v. Briones*, the Ninth Circuit emphasized that "a juvenile's conduct after being convicted and incarcerated is a critical component of the resentencing court's analysis" when evaluating whether a juvenile offender is capable of rehabilitation or is instead permanently incorrigible. 929 F.3d 1057, 1064 (9th Cir. 2019) (en banc). And in *United States v. Pete*, the Ninth Circuit held that a district court abused its discretion in denying a juvenile offender's request for a neuropsychological evaluation upon resentencing, because whether the offender had changed or grown in maturity or emotional health since the offense was "surely key evidence" for the *Miller* inquiry. 819 F.3d 1121, 1133 (9th Cir. 2016).

McCain assures us that he does not question the relevance of postconviction conduct to resentencing, and rightly so. Sentencing courts "'exercise a wide discretion' in the types of evidence they may consider when imposing sentence," including "'the fullest information possible concerning the defendant's life and characteristics.'" *Pepper v.*

17

*United States*, 562 U.S. 476, 480 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 246–247 (1949)); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). As the Supreme Court has explained in the context of postconviction rehabilitation, such evidence "may be highly relevant to several of the [Section] 3553(a) factors" that a district court must consider at resentencing, such as the history and characteristics of the defendant, the defendant's likelihood of future criminal conduct, and the need to provide the defendant with training or treatment. *Pepper*, 562 U.S. at 491 (citing 18 U.S.C. § 3553(a)(1), (a)(2)(B)–(D)). The Court's reasoning is no less applicable where, as here, the postconviction evidence is overwhelmingly negative.

At bottom, McCain argues that the district court should have weighed the sentencing factors differently. But district courts have "extremely broad discretion" in this regard. *United States v. Jeffery*, 631 F.3d 669, 679 (4th Cir. 2011). The district court here conducted a thorough resentencing and did not abuse its discretion in its consideration of McCain's age at the time of the offense or his postconviction diagnosis and conduct.

B.

McCain also advances a second ground for procedural unreasonableness: he contends that the district court failed to address his request for an alternative sentence incorporating "*de facto* parole," under which McCain would receive periodic judicial review of his sentence and release upon a showing of satisfactory rehabilitation.

18

"Where the defendant or prosecutor presents nonfrivolous reasons for imposing a different sentence," the district court should "explain why [it] has rejected those arguments." *Rita*, 551 U.S. at 357. In our view, McCain's parole request, if not frivolous, has little to commend it. After all, Congress abolished parole for federal offenses committed after November 1, 1987, in the Sentencing Reform Act of 1984, Pub. L. No. 98-473, Title II, 98 Stat. 1987. *See Richmond v. Polk*, 375 F.3d 309, 316 (4th Cir. 2004); *see also Under Seal*, 819 F.3d at 719 n.4. And McCain has identified no statute, rule, or caselaw that would authorize a district court to periodically reconsider a final sentence. To the contrary, Congress has instructed that a court "may not modify a term of imprisonment once it has been imposed" except in narrow circumstances McCain does not invoke here. 18 U.S.C. § 3582(c); *see* 28 U.S.C. § 2255(a), (f), (h) (detailing the restrictions on initial and successive motions collaterally attacking a sentence); *see generally* Fed. R. Crim. P. 35.

In any event, the adequacy of a sentencing court's explanation depends on the circumstances of each case. *See Rita*, 551 U.S. at 356 ("The appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances."). The sentencing court need only "set forth enough to satisfy the appellate court that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority." *Id.* The district court here amply explained why it concluded that "the harshest possible penalty"—life imprisonment *without* parole—was appropriate. J.A. 242; *see* J.A. 259–260. That explanation sufficiently elucidated the court's reasons for rejecting McCain's request for "*de facto* parole."

19

C.

Finally, McCain contends that his life sentence is substantively unreasonable because the facts of the crime and his personal characteristics do not show he is among the rare irreparably corrupt juvenile offenders. As previously explained, we review the substantive reasonableness of the sentence "under an abuse-of-discretion standard," considering "the totality of the circumstances." *Gall*, 552 U.S. at 51.[3] Applying this standard, we may "reverse a sentence *only* if it is unreasonable, even if the sentence would not have been the choice of the appellate court." *United States v. Evans*, 526 F.3d 155, 160 (4th Cir. 2008); *see Gall*, 552 U.S. at 51 ("The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court."). As the Supreme Court has explained, this deferential standard is appropriate because the sentencing court "is in a superior position to find facts and judge their import under [Section] 3553(a) in the individual case." *Gall*, 552 U.S. at 51 (internal quotation marks omitted). The district court "sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." *Id.* (internal quotation marks omitted).

---

[3] Neither party urges us to apply a different standard of review to the district court's conclusion that McCain qualifies as "the rare juvenile offender whose crime reflects irreparable corruption." *Montgomery*, 136 S. Ct. at 734 (internal quotation marks omitted). Nor have the parties briefed the question, currently pending before the Supreme Court, whether the district court was required to make an explicit factual finding of permanent incorrigibility. *See Jones v. Mississippi*, 140 S. Ct. 1293 (2020); *see also Montgomery*, 136 S. Ct. at 735 ("That *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment.").

The district court here thoroughly examined each of the *Miller* factors as they pertain to McCain. Although McCain would reach a different conclusion than the district court, he does not contend that the court misapprehended or misapplied any of the relevant considerations. The district court concluded that "the hallmark features associated with young age," such as impulsivity and lack of maturity, did not play "any substantive role in [McCain's] commission of these crimes," J.A. 259, after noting the Government's argument that McCain was a "capable," "street smart" "heroin dealer" whose crimes "were cold and calculated, targeting two victims, with premeditation, literally executing one victim and maiming another," J.A. 247, 249; *see Miller*, 567 U.S. at 471, 477. As for McCain's family and home environment, the district court observed that he "was not abused in his home" or "otherwise impaired through those things, other than things we too often see with people in dysfunctional families." J.A. 259; *see Miller*, 567 U.S. at 471, 477. The court acknowledged, but was not persuaded by, McCain's contention that he committed the crimes out of "immature loyalty to a friend." J.A. 243; *see* J.A. 257 ("[T]he doctor[] said there's a big difference between a 13 or 14 year old and a 17 or 18 year old as regards peer pressure."); *see also Miller*, 567 U.S. at 471, 477. The court recounted McCain's juvenile criminal record and the Government's argument that, by age 17, McCain was "very familiar with [the] criminal justice system" and "able to assist his attorneys, as he was represented by counsel on each of those [prior] cases." J.A. 248–249; *see Miller*, 567 U.S. at 477–478. As for rehabilitative potential, the court reviewed the long list of McCain's serious misconduct since his arrest and turning 18 years old, including stabbing another inmate at least sixteen times, multiple "disturbing" instances of

21

assaulting and threatening other inmates and correctional officers, and sexually assaulting a female inmate while awaiting his resentencing. J.A. 251–254, 258; *see Miller*, 567 U.S. at 471, 478. Although the court acknowledged McCain's "relative lack of rehabilitative opportunities" in prison, J.A. 244, it concluded that his postconviction conduct and antisocial personality disorder diagnosis demonstrated a lack of rehabilitative potential. *See* J.A. 259 ("That disorder still controls his action and his thinking.").

Given this record, we cannot conclude that the district court abused its discretion in determining that McCain's crimes, committed when he was 7-and-a-half months shy of his 18th birthday, reflected irreparable corruption rather than "the transient immaturity of youth." *Montgomery*, 136 S. Ct. at 734. The court acknowledged that a sentence of life imprisonment without parole for a juvenile offender should be "uncommon," J.A. 242, but "reluctantly conclude[d] this may be one of those uncommon cases where sentencing a juvenile to the hardest possible penalty is appropriate," J.A. 260. Giving requisite deference to the district court's role in assessing the evidence and the offender, we cannot find its sentence unreasonable.

IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*