**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-4442**

---

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

ANTHONY JAMES GROSS,

        Defendant – Appellant.

---

Appeal from the United States District Court for the Western District of North Carolina, at Asheville. Max O. Cogburn, Jr., District Judge. (1:21−cr−00046−MOC−WCM−1)

---

Argued: December 6, 2023                            Decided: January 12, 2024

---

Before WILKINSON, NIEMEYER, and AGEE, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge Agee joined.

---

**ARGUED:** Melissa Susanne Baldwin, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellant. Anthony Joseph Enright, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** John G. Baker, Federal Public Defender, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

WILKINSON, Circuit Judge:

Anthony Gross pleaded guilty to unlawful possession of a firearm after he shot at and injured a man in his family's driveway. The district court sentenced Gross to 63 months' imprisonment and 3 years of supervised release. Gross challenges two aspects of the court's Sentencing Guidelines calculation: its application of a sentencing enhancement for causing "serious bodily injury" and its cross-reference to the aggravated assault guideline. At the core of Gross's appeal is his contention that we should review the district court's finding of serious bodily injury de novo.

We disagree. To adopt the de novo standard here would turn law in a direction inhospitable to factfinders. The district court's finding that Gross caused serious bodily injury was an application of the Guidelines that turned on a question of fact, and thus we review it for clear error. In so doing, we find that the district court did not clearly err in its Guidelines calculation and affirm its judgment.

## I.

### A.

On the morning of May 17, 2021, Anthony Gross, his parents, and his girlfriend were at his family's home in Marshall, North Carolina. Gross's girlfriend told the others that a man whom they had known for years, A.C., had sexually assaulted her the night before. The family had been letting A.C. stay over while he went through a period of addiction and homelessness, and nearly everything he owned was at their house. A.C. himself, however, was nowhere to be found.

2

That soon changed. Around 10:00 am, A.C. drove up on a motorcycle, parked on the family's driveway, and pushed his helmet up onto his head. Gross's mom saw A.C. in the driveway and told him he needed to leave. A.C. retorted that he had a right to retrieve his belongings. Gross's father then came out to talk to A.C., who remained perched on his bike, refusing to leave.

Gross walked out onto the porch, shirtless and holding a long gun. A.C. was undeterred. He stayed on his bike and demanded that he be allowed to retrieve his property. Gross stepped off the porch and, gun in hand, walked down the driveway towards A.C. He stopped about three car lengths away, raised his firearm, and fired a shot. According to A.C.'s testimony, Gross had said he was going to shoot A.C. and pointed the gun at him before firing. The shot hit the ground, causing a puff of dust to rise up. Three metal fragments—either from the shot, the motorcycle, or another nearby object—hit A.C. near his right eye. He began bleeding and, once he got his wits about him, ran up a hill into the woods to take refuge and find help. He eventually found a neighbor who took him in and called 911.

While waiting for emergency services to arrive, A.C. felt that "the pain was getting pretty bad" and was "nervous," "nauseous," and "shocked." J.A. 84. Paramedics picked him up and drove him in an ambulance to the emergency room at Mission Hospital in Asheville. A.C. initially told the paramedics that he was not in pain, potentially due to the "adrenaline" that had "kicked in" when he was shot. *Id.* at 82. Indeed, once he arrived at the hospital, A.C. told doctors that he was in pain, and he received fentanyl and Benadryl to quell it. The doctors also examined his eye and took a CAT scan. The scan revealed

3

three metal fragments, ranging from 1 to 3 millimeters wide, lodged near his eye. The doctors did not remove the fragments to avoid exacerbating the bruising and swelling around his eye. One doctor expressed surprise that A.C. had suffered a gunshot wound because his eye was fully functional and his injuries were "superficial." *Id.* at 116.

A.C. was not admitted as a patient at the hospital, did not require surgery, and left the emergency room after a few hours. But that night, he went to Pardee Hospital in Hendersonville for a second opinion, as he was still experiencing "real sharp pain." *Id.* at 90. He testified that it felt "like something was poking [him] in [his] eye" and that light was affecting his vision to the point where he "couldn't really see." *Id.* When asked to compare the pain to previous experiences, A.C. said it was "[p]robably one of the worst pains I [have] had." *Id.* at 84.

In the following days, A.C. continued to have "real sharp pain in the back of [his] eye." *Id.* at 102. While his visible injuries dissipated within two weeks, A.C. reported that he has experienced chronic sinus problems since the incident. He testified that his sinuses were "constantly draining . . . like [he has] an infection," *id.* at 92, and speculated that this could be because of an allergy to the metal fragments that remained near his eye. A forensic pathologist who provided expert testimony for the defense countered that the fragments were unlikely to cause congestion because they were located "nowhere near" his sinuses. *Id.* at 118. A.C. testified, however, that he remained "[k]ind of shocked about the whole situation" and was struggling to process the ordeal emotionally. *Id.* at 93.

B.

4

This shooting was not Gross's first encounter with the law. He had already been convicted of numerous criminal offenses, including six felonies. And on June 1, 2021, a grand jury in the Western District of North Carolina indicted Gross with knowing and unlawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Gross pleaded guilty on November 17, 2021. He admitted to being a felon in unlawful possession of a firearm and agreed to the government's statement of facts.

Gross was separately charged in North Carolina court with possession of a firearm by a felon, N.C. Gen. Stat. Ann. § 14-415.1, and felonious assault with a deadly weapon with intent to kill or inflicting serious injury, *id.* at § 14-32.

In preparation for the sentencing hearing, the U.S. Probation Office created a presentencing investigation report (PSR) which computed the Sentencing Guidelines range for Gross's offense. The PSR calculated the total offense level by applying a cross-reference and two sentencing enhancements. First, because Gross used the firearm in connection with the commission of another offense (North Carolina felonious assault with a deadly weapon with intent to kill or inflicting serious injury), the PSR cross-referenced the guideline of the most analogous substantive federal offense (U.S.S.G. § 2A2.2 aggravated assault) to find a base offense level of 14. *See* U.S.S.G. §§ 2K2.1(c)(1), 2X1.1, 2A2.2(a). Second, the PSR added 5 offense levels because Gross discharged the firearm. *See id.* at § 2A2.2(b)(2)(A). Third, the PSR added an additional 5 offense levels because it found Gross caused "serious bodily injury." *Id.* at § 2A2.2(b)(3)(B). Upon reaching an offense level of 24 based on the cross-reference and the two enhancements, the PSR

5

included a 3-level reduction for acceptance of responsibility under § 3E1.1 to reach a total offense level of 21.

Next, the PSR found Gross's criminal history category to be VI, the highest possible option. Based on the total offense level of 21 and the criminal history category of VI, the PSR determined that the Guidelines imprisonment range was 77 to 96 months.

Gross submitted written objections to two elements of the PSR's Guidelines calculation and renewed these objections at the July 19, 2022 sentencing hearing. First, Gross argued that the court should not apply a sentencing enhancement for serious bodily injury because he only caused ordinary bodily injury. Second, he claimed that the court should not cross-reference the aggravated assault guideline because he neither intended to cause bodily injury nor caused serious bodily injury. *See* U.S.S.G. § 2A2.2 cmt. n.1 (defining aggravated assault as "felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; [or] (B) serious bodily injury"). Gross called a forensic pathologist with expertise in gunshot wounds as an expert witness to support his claim that only ordinary bodily injury occurred. Additionally, Gross argued for a downward variance because he had a traumatic brain injury that affected his impulsivity at the time of the shooting and was amenable to treatment.

The government countered that the preponderance of evidence showed that Gross caused serious bodily injury and thus both sentencing enhancements should apply. It called A.C. as a witness to substantiate its argument that he had sustained serious bodily injury.

After hearing from the parties and their witnesses, the district court overruled Gross's objections. It stated, "the injuries as described with regard to the eye and to what the victim had, the fact that we have hospital records backing it up and him going to the hospital in the ambulance, all those things together with the government putting that evidence on is going to be enough." J.A. 133. The court went on to "find that th[e injury] is a serious injury. It's not on the high side of arm amputation or something like that, but it's serious and it could ultimately cause problems." *Id.* at 133–34. It later reiterated that A.C. "suffered . . . serious bodily injury," *id.* at 140, and observed that the injury "meets the test of serious injury," *id.* at 141. The court also determined that "the cross-reference does apply." *Id.* at 134. It thus adopted the PSR's Guidelines calculation, finding that the range was "properly calculated at 77 to 96 months." *Id.*

The court did, however, credit Gross's request for a downward variance due to his brain injury. It applied a 2-level reduction to the total offense level, bringing Gross's Guidelines range to 63 to 78 months. The court then sentenced Gross to 63 months' imprisonment and 3 years of supervised release. Gross timely appealed.

II.

Gross contends that his sentence was procedurally unreasonable because the court failed to calculate his Guidelines range correctly. *See Gall v. United States*, 552 U.S. 38, 51 (2007) (stating that improper calculation of the Guidelines range renders a sentence procedurally unreasonable). In so arguing, Gross relies upon the same two objections to the Guidelines calculation that he raised below. First, he claims that the district court erred in applying the 5-level enhancement for serious bodily injury because the record only

7

supported a finding of ordinary bodily injury. Second, he claims that the court's findings did not support its cross-reference to the aggravated assault guideline.

A.

We start with the standard of review, which is a primary point of contention between the parties in this case. This court reviews a challenge to a sentence's procedural reasonableness under a "'deferential abuse-of-discretion standard.'" *United States v. McCain*, 974 F.3d 506, 515 (4th Cir. 2020) (quoting *Gall*, 552 U.S. at 41). Both parties acknowledge that, when assessing a Guidelines calculation under this standard, we review "the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Pena*, 952 F.3d 503, 507 (4th Cir. 2020). But they disagree about whether the application of the Guidelines to the facts of the case should be reviewed for clear error or de novo. Gross posits that the Guidelines application here "turns on a legal interpretation," and thus "de novo review is appropriate." *United States v. Dodd*, 770 F.3d 306, 309 (4th Cir. 2014). The government, on the other hand, argues that a district court's decision to apply an enhancement for serious bodily injury is reviewed for clear error. *See United States v. Saint Louis*, 889 F.3d 145, 158 (4th Cir. 2018).

We hold that a district court's finding that a defendant caused serious bodily injury is reviewed for clear error when the district court applied the correct legal standard, as it did here. The district court used the Guidelines to identify the proper standard of law: that it should increase the total offense level by 5 levels if it found that the victim sustained serious bodily injury. U.S.S.G. § 2A2.2(b)(3)(B). It then applied this legal standard to its factual findings to determine that Gross's shooting caused A.C. to sustain "serious bodily

8

injury." J.A. 140. The court concluded that "the injury that was suffered . . . meets the test of serious injury," *id.* at 141, after it considered "the injuries as described" by the victim and the supporting "hospital records." *Id.* at 133. Because this application of the correct legal standard turned primarily on questions of fact, we review it for clear error. *See United States v. Reed*, 75 F.4th 396, 404–05 (4th Cir. 2023); *United States v. Adepoju*, 756 F.3d 250, 256–57 (4th Cir. 2014); *United States v. Steffen*, 741 F.3d 411, 414 (4th Cir. 2013); *United States v. ReBrook*, 58 F.3d 961, 969 (4th Cir. 1995).

Gross cites *United States v. Lewis*, 18 F.4th 743 (4th Cir. 2021), for the proposition that sentencing enhancements based on findings of bodily injury under § 2A2.2(b)(3) are reviewed de novo. In *Lewis*, this court conducted de novo review to find that a 2-level sentencing enhancement for ordinary bodily injury was procedurally unreasonable. *Id.* at 750. But there, the district court had disregarded the Fourth Circuit's legal standard for bodily injury as set out in *United Sates v. Lancaster*, 6 F.3d 208, 209–10 (4th Cir. 1993) (per curiam). After "guess[ing]" that the victim had suffered a minor concussion, the court found that the bodily injury sentencing enhancement applied because the victim "just ha[d] to have an injury that caused him to seek medical attention, and he did." *Lewis*, 18 F.4th at 747. This test contradicted the legal standard established in *Lancaster*, which required a district court, in determining that a defendant caused bodily injury, to make specific factual findings beyond merely stating that the injury caused the victim to seek medical attention. *See Lewis*, 18 F.4th at 748–51 (citing *Lancaster*, 6 F.3d at 209–11 & n.2). Because the district court in *Lewis* fashioned its own legal standard that was at odds with circuit

9

precedent for determining what type of injury qualified for a sentencing enhancement, its decision was appropriately reviewed de novo.

Unlike in *Lewis*, the district court here made no statements that contradicted existing circuit precedent on the definition of serious bodily injury. Nor did the court formulate any rules of general application for serious bodily injury. Rather, it merely explained why its factual findings established that the legal standard for serious bodily injury had been met. We therefore review for clear error. *See United States v. Saint Louis*, 889 F.3d 145, 158 (4th Cir. 2018) (applying clear error standard in upholding district court's application of sentencing enhancement for serious bodily injury); *United States v. Maynard*, No. 22-4178 at *12 (4th Cir. 2024) (slip op.) (same); *Buford v. United States*, 532 U.S. 59, 64–66 (2001) (holding that a Guidelines application decision should be reviewed deferentially on appeal).

Gross further contends that the district court did not apply the correct legal standard because it did not explicitly reference the Guidelines commentary that sets out three categories of serious bodily injuries. *See* U.S.S.G. § 1B1.1 cmt. n.1(M). We agree that the Guidelines commentary is generally authoritative. *United States v. Moses*, 23 F.4th 347, 357 (4th Cir. 2022) (citing *Stinson v. United States*, 508 U.S. 36, 38 (1993)). But we reject the notion that a district court must mechanically tick through the categories of serious bodily injury in the Guidelines commentary or else face de novo scrutiny. Absent evidence to the contrary, we presume that the district court knew the law and applied it in making its decisions. *See United States v. Ali*, 991 F.3d 561, 570 (4th Cir. 2021). Because the court

10

here did not state it was relying on a rule of general application that differed from the one set out in the Guidelines, we refuse to assume it disregarded the correct legal standard.

It makes good sense for us to exhibit due deference when reviewing a district court's finding of serious bodily injury. Too often appellate panels are dragged down into second-guessing district courts' fact-intensive applications of the Guidelines de novo, emboldened by appellants' assurances that we are merely resolving questions of law. But determining whether a victim's wounds satisfy the definition of serious bodily injury is an application of the Guidelines that "depend[s] on an evaluation and weighing of the factual details, even though the details themselves may have been undisputed." *United States v. McVey*, 752 F.3d 606, 610 (4th Cir. 2014). As we noted in *Lancaster*,

> [Whether an injury qualifies for a sentencing enhancement] should be determined by a very factually-specific inquiry which takes into account a multitude of factors, some articulable and some more intangible, that are observable in hearing the evidence presented on the injury. Because the district court hears this evidence, it is by far best-situated to assess these myriad factors and determine whether a "significant injury" has occurred. We, as the court of appeals, are in a far less advantageous position to make this determination as we have before us only the written record and this record is often inadequate in conveying many of these factors. As a result of our position, our ability to review the district court's determination of whether a "significant injury" has occurred is quite limited and we will disturb it only when the record reveals that the district court clearly erred.

6 F.3d at 210 (upholding ordinary bodily injury finding on clear error review).

The essentially factual determination of whether serious bodily injury occurred thus is reviewed for clear error, *see Saint Louis*, 889 F.3d at 158, except where the district court explicitly identified and applied the wrong legal standard, *see Lewis*, 18 F.4th at 750–51. *See also United States v. Gasca-Ruiz*, 852 F.3d 1167, 1173 (9th Cir. 2017) (en banc)

11

(holding that an application of the serious bodily injury enhancement should be reviewed with deference because "[d]istrict courts are better situated than appellate courts to make the fact-specific determinations inherent in virtually all guideline-application decisions"). Clear error review is particularly appropriate where, as here, the district court heard directly from the victim who suffered the injury. To hold otherwise would be to erode the authority that district courts have to hear evidence, find facts, and draw inferences from them.

Because we are reviewing for clear error, we uphold the district court's determination so long as it was "plausible in light of the record viewed in its entirety." *United States v. Ferebee*, 957 F.3d 406, 417 (4th Cir. 2020). But if we are "left with the definite and firm conviction that a mistake has been committed," we reverse and remand for resentencing. *United States v. Dugger*, 485 F.3d 236, 239 (4th Cir. 2007).

### B.

We hold that the district court did not clearly err in finding that Gross caused A.C. to sustain serious bodily injury. The Guidelines commentary defines "serious bodily injury" as an injury (1) "involving extreme physical pain"; (2) involving "the protracted impairment of a function of a bodily member, organ, or mental faculty"; or (3) "requiring medical interventions such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1 cmt. n.1(M). Because "this definition uses the disjunctive 'or,' the Guideline applies where the victim suffered any one of these ailments." *United States v. Flores*, 974 F.3d 763, 765 (6th Cir. 2020). Therefore, "[e]xtreme physical pain" is enough to sustain a finding of "serious bodily injury," even if the victim "did not seek out medical intervention and did not suffer protracted impairment." *Saint Louis*, 889 F.3d at 158.

12

Here, the district court was within its discretion to find that A.C. sustained an injury involving extreme physical pain. A.C. emphasized the painfulness of the injury throughout his testimony at the sentencing hearing. He recounted that it caused "real sharp pain" that felt "like something was poking [him] in [his] eye." J.A. 90. And he assessed that it was "[p]robably one of the worst pains I [have] had." *Id.* at 84. Moreover, the medical records from Mission Hospital established that A.C. was given fentanyl—a potent pain management drug—to mitigate the pain he experienced while in the emergency room.

Gross contends that the evidence cannot substantiate a finding that A.C. suffered extreme physical pain. He posits that A.C. denied he was in pain when he was in the ambulance, that the expert forensic pathologist asserted that A.C.'s injury would merely cause "some pain or discomfort," *id.* at 125, and that the hospital records referred to the injury as "superficial," *id.* at 204. But the district court was best-positioned to evaluate and weigh these factual details. *See Lancaster*, 6 F.3d at 210. Indeed, Gross raised these arguments below, and the district court rejected them. We therefore conclude that the court did not clearly err in finding that A.C. suffered extreme physical pain—and, hence, serious bodily injury—when a gunshot caused three metal fragments to lodge near his eye, resulting in "[p]robably one of the worst pains" he had ever experienced. J.A. 84.

A.C.'s testimony of a protracted impairment to his nasal function also supported the court's finding of serious bodily injury. *See* U.S.S.G. § 1B1.1 cmt. n.1(M). A.C. recounted that, since the injury, his sinuses have been "constantly draining . . . like [he had] an infection." J.A. 92. The defense's expert witness questioned the causal relationship between A.C.'s congestion and the injury. But it was within the court's discretion to assess

13

that A.C.'s sinus issue resulted from the injury. And this ongoing issue could constitute a "protracted impairment" sufficient to establish serious bodily injury under U.S.S.G. § 1B1.1 cmt. n.1(M).

Gross vigorously disputes all this, arguing that the district court strayed from its factfinding role on the way to what was a legal conclusion. But drawing inferences from primary facts does not elevate the standard of review to one of de novo. Take the primary fact that three metal fragments were lodged near the victim's eye. Inferring that those fragments made A.C.'s testimony of extreme physical pain more credible was well within the sentencing court's observational competency. Credibility findings are but another species of factual determination, *see Merzbacher v. Shearin*, 706 F.3d 356, 367 (4th Cir. 2013), and inferences drawn from primary facts to the ultimate fact of serious bodily injury afford no basis for a diminution of appellate deference. They are all part of the family of facts and, as such, must be treated by reviewing courts accordingly.

The upshot is that the record provided ample evidence for the district court to find that the victim sustained serious bodily injury as defined in the Guidelines commentary. We therefore cannot state that the court's judgment was clearly erroneous.

C.

Because we affirm the district court's finding of serious bodily injury, we also affirm its decision to cross-reference the aggravated assault guideline. Gross conceded at oral argument that his challenge to the cross-reference rests on his claim that he did not inflict serious bodily injury—a claim we resolved against him. We therefore reject Gross's challenge to the cross-reference.

14

In doing so, we note that the district court correctly applied the cross-reference provision in U.S.S.G. § 2K2.1(c)(1). "[W]hen a felon in possession of a firearm uses that firearm in connection with another offense, . . . the court must apply the offense level for that other offense, thereby cross-referencing it to determine the ultimate sentence," if the other offense's level "is higher than the offense level under § 2K2.1." *United States v. Burns*, 781 F.3d 688, 691 (4th Cir. 2015) (citing U.S.S.G. § 2K2.1(c)(1)). This requires the court to determine (1) what that "other offense" is and (2) its offense level under the Guidelines. When the other offense is not in the Guidelines' Statutory Index, the court must cross-reference "the most analogous guideline." U.S.S.G. § 1B1.2(a); *see also id.* at §§ 2X1.1 cmt. n.3; 2X5.1.

Here, the PSR identified the other offense as North Carolina felonious assault with a deadly weapon with intent to kill or inflicting serious injury—the crime that Gross was charged with in state court. *See* N.C. Gen. Stat. Ann. § 14-32. Because this state law offense is not in the Statutory Index, the PSR concluded that the aggravated assault guideline in U.S.S.G. § 2A2.2 was the most analogous guideline. Upon determining that the aggravated assault guideline resulted in a higher offense level, the PSR cross-referenced it.

Gross objected to the cross-reference, and the district court heard arguments from the parties about whether it should adopt it. Ultimately, the court chose to adopt the PSR's finding "that the cross-reference does apply." J.A. 134. It was well within the court's discretion to do so because the aggravated assault guideline—which defines aggravated assault as "felonious assault that involved . . . serious bodily injury," U.S.S.G. § 2A2.2 cmt. n.1—was the most analogous guideline to North Carolina felonious assault with a deadly

15

weapon inflicting serious injury, N.C. Gen. Stat. Ann. § 14-32. Moreover, because we upheld the district court's finding of serious bodily injury, Gross's claim that his conduct did not justify the cross-reference to the aggravated assault guideline is meritless.

### III.

Courts opine often on separation of powers. But separation of functions has its own importance. To leave de novo review loose and on the prowl is to devour the tasks that district courts do best. The trial court found the pertinent fact here, and we readily affirm its judgment.

*AFFIRMED*