**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 21-4312**

───────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JOSHUA AARON ROY,

Defendant – Appellant.

───────────

**No. 21-4327**

───────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JOSHUA AARON ROY,

Defendant – Appellant.

───────────

Appeals from the United States District Court for the Northern District of West Virginia at Elkins.  Thomas S. Kleeh, Chief District Judge.  (2:20-cr-00035-TSK-MJA-1; 2:20-cr-00026-TSK-MJA-4)

───────────

2

Argued:  October 27, 2023                    Decided:  December 12, 2023

---

Before DIAZ, Chief Judge, WILKINSON, Circuit Judge, and Robert S. BALLOU, United States District Judge for the Western District of Virginia, sitting by designation.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Diaz and Judge Ballou joined.

---

**ARGUED:** Edmund J. Rollo, Morgantown, West Virginia, for Appellant.  Stephen Donald Warner, OFFICE OF THE UNITED STATES ATTORNEY, Elkins, West Virginia, for Appellee.  **ON BRIEF:**  William Ihlenfeld, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

---

WILKINSON, Circuit Judge:

Joshua Roy pleaded guilty to unlawful possession of a firearm and aiding and abetting possession with intent to distribute at least 40 grams of fentanyl. The court sentenced Roy to 120 months' imprisonment and 5 years of supervised release. Roy challenges his sentence as procedurally unreasonable, claiming the district court erred by relying on facts that were clearly erroneous or outside the record. We find this claim unpersuasive and affirm the judgment below.

## I.

### A.

In January 2020, Joshua Roy was driving his stepdaughter Kelsey Ault and her partner Joshua Rutherford in Rutherford's Cadillac. Law enforcement officers had the vehicle under surveillance because they suspected that Rutherford was transporting narcotics from Baltimore to West Virginia. The officers conducted a traffic stop in Wardensville, West Virginia, and asked everyone to step out of the vehicle. Roy and Ault complied. Rutherford, who was sitting in the back seat, made a run for it. After a foot chase, officers caught Rutherford and seized 447 fentanyl capsules weighing 61.98 grams that he had taken out of the car with him. Rutherford, Roy, and Ault were arrested. After being read his *Miranda* rights, Roy admitted that the group had traveled to Baltimore so that Rutherford and Ault could acquire heroin. Roy claimed that he joined the trip to protect his stepdaughter and drove the car because he was the only one with a license.

Ten days later, police officers responded to a report of shoplifting at a gas station in Petersburg, West Virginia. Officers identified the getaway vehicle on surveillance footage

3

and stopped it thirty minutes later. They found Roy, who had been released from custody after the fentanyl arrest, behind the wheel, and another person sitting beside him. A search of the vehicle revealed a handgun and box of ammunition in the center console. Officers determined that Roy was a felon and arrested him for unlawful possession of a firearm. While in custody, Roy told his wife on a recorded phone line that the gun belonged to him.

In August 2020, a federal grand jury in the Northern District of West Virginia charged Roy with conspiracy to distribute at least 40 grams of fentanyl, interstate travel to promote an unlawful activity, and aiding and abetting possession with intent to distribute at least 40 grams of fentanyl. In October 2020, Roy was also charged with unlawful possession of a firearm.

These charges were far from Roy's first brushes with the law. He had previously been convicted of 27 non-traffic offenses, including nighttime burglary, burglary, grand larceny, breaking and entering, contempt of court, and domestic battery.

Pursuant to a written agreement, Roy pleaded guilty to two counts: (1) aiding and abetting possession with intent to distribute at least 40 grams of fentanyl in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(vi), and 18 U.S.C. § 2; and (2) possession of a firearm as a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924. Roy also waived his right to appeal his sentence. In turn, the government agreed to pursue concurrent sentences for the two offenses in a single sentencing proceeding and to recommend a sentence at the lowest end of the Sentencing Guidelines.

B.

4

At the sentencing hearing, the district court determined that Roy's Guidelines range was 77 to 96 months' imprisonment and 2 to 5 years of supervised release. Roy offered no objections to the court's calculation, which was based on the presentence report that Roy, his counsel, and the government each confirmed they had reviewed and accepted.

The district court forewarned that it was "consider[ing] a potential upward variant sentence" due to "Mr. Roy's criminal history, as well as the amount of fentanyl that we are dealing with here." J.A. 22. The court then let Roy proceed with allocution. Roy revealed that his stepdaughter Ault had recently died as a result of her fentanyl use. He apologized for his actions and stated that his addiction had motivated his criminal behavior. He also claimed his stepdaughter's death had caused him to consider the consequences of his actions and become a changed man.

The court next gave Roy's counsel and the government an opportunity to recommend a sentence and to challenge the court's reasoning for its proposed upward variance. Roy's counsel maintained there was no need for an upward variance because the Guidelines calculation already accounted for the large amount of fentanyl and Roy's significant criminal history. The prosecutor agreed, stating that the leadership of the U.S. Attorney's Office had reviewed the plea agreement and that the Department of Justice stood behind it. While the prosecutor acknowledged that the case may have involved the largest quantity of fentanyl that he had ever seen, he noted that Roy had been forthright, truthful, and cooperative throughout the investigation. He urged the court to sentence Roy at the lowest end of the Guidelines.

The court acknowledged that Roy's criminal history and offense levels were "already baked into the [G]uideline ranges." J.A. 28. But it found "the [G]uidelines here could arguably be said to be inadequate" with regard to fentanyl "because of its increased prevalence here but more importantly how fatal it is." J.A. 29–30. In the court's view, "[n]either Congress [n]or the sentencing commission has caught up to what that substance is and what it does. And if I could be so frank to say it, perhaps they don't have the appreciation for the scope of that problem here in our communities and here, again, on the ground." J.A. 30–31.

After spending nearly 50 minutes calculating Roy's Guidelines range, hearing input from each party, and providing a lengthy explanation for the upward variance, the district court sentenced Roy to 120 months' imprisonment and 5 years of supervised release. While the court noted that an upward variance was "something I don't do lightly or undertake lightly," it found that the Guidelines range was inadequate because of the "shocking amount" of fentanyl at issue and the drug's "toxicity and ability to kill in such small doses." J.A. 47. The court observed that the amount of fentanyl was the most that he had seen in his time on the bench, and that it likely had the potential to kill thousands if not tens of thousands of people. After referencing the sentencing factors contained in 18 U.S.C. § 3553(a), the court found its sentence to be "sufficient to adequately but not excessively punish Mr. Roy for the seriousness of the offense behavior in this case." J.A. 47.

## C.

Despite having waived his right to appeal his sentence, Roy appealed. His counsel filed an *Anders* brief to this court—the process by which a criminal defense counsel moves

6

to withdraw from his client's appeal because he believes it does not present a nonfrivolous legal claim. *See Anders v. California*, 386 U.S. 738 (1967). The government agreed that the appeal did not raise any meritorious issues and did not file a response brief. We concluded, however, that the appeal presented issues that would benefit from adversarial presentation. We thus directed supplemental briefing on "whether the district court procedurally erred in relying on two facts that were either clearly erroneous or outside the record at sentencing—namely, that Roy possessed a firearm in connection with the drug possession offense and that fentanyl is so potent that it can cause one who simply touches it to overdose."

## II.

In his supplemental brief, Roy contends that the court made statements during the sentencing hearing that show it relied on facts that were clearly erroneous or outside the record. Specifically, he claims that the court erred in expressing beliefs that (1) fentanyl is dangerous to touch, (2) the fentanyl offense and firearm offense were connected, and (3) Roy possessed multiple firearms. Roy first cites two statements that the district court made which indicated its belief that fentanyl is dangerous to touch. The court said:

> I can't get over a conversation I had with a law enforcement officer in connection with [a previous] case who, during a break in the trial, cautioned me against touching the bag of fentanyl that was sitting there. I ha[d] never seen fentanyl before. I have led a shockingly sheltered life; one that I am not thankful enough and appreciative enough for every day. So dumbly curious, I remember touching this bag of fentanyl that had been admitted into evidence. And that law enforcement officer came over and cautioned me against touching it, and was telling me stories of law enforcement officers merely brushing their hands against pants after they took their gloves off at a crime scene and having to be taken to the hospital for overdose reactions.

7

That's anecdotal and all of that, but I don't think anyone here is arguing or would contest the toxicity of fentanyl and how, again, fatal it is.

J.A. 30.

The court went on to say:

I just don't think folks have an appreciation for how lethal it is. . . . [T]he body count [from] fentanyl keeps stacking up—not even in cases that we see. Just turn the news on. Read the newspaper. It's terrifying. And it's not even— like I said, it's not even a substance that you need to go out of your way to procure, and inject, consume, smoke, whatever. If you come in contact with it, it can kill you.

J.A. 35.

Next, Roy claims the court made two statements that impermissibly drew a connection between the fentanyl Roy transported and the firearm he possessed. Roy also takes issue with the court referring to multiple "firearms" in these statements because Roy only possessed a single firearm. The court stated:

[T]he quantities we are talking about, the firearms, the amount, again, that we are dealing with, this wasn't feeding your addiction. You will never convince me otherwise. Most addicts aren't armed. They are just looking to score. They are looking to score their next dose. This was a business for you, and that is apparent just on its face. . . . [Y]ou will never convince me otherwise that your involvement here was anything less than trafficking. It clearly was given, again, the amount, the presence of firearms, and the rest.

J.A. 37.

Later, when explaining its sentencing decision, the court said:

The Court is also struck in particular [by], again as reflected in [the unlawful possession of a firearm case], the presence of firearms here, which indicates a couple things to this Court: one, instantaneous danger that was injected in Mr. Roy's activities in connection with his criminal undertaking in these two cases. The Court is struck by the amount of fentanyl that we are talking about and the presence of the firearm, or firearms as the case may be, noting that each independently can be lethal.

8

J.A. 47.

III.

Citing these four statements, Roy argues that his sentence was procedurally unreasonable because the district court's upward variance was based on clearly erroneous facts or evidence outside the record. He contends that the district court's improper reliance on this evidence requires us to remand his case for resentencing. Because we find that the district court's sentence was not based on clearly erroneous facts or evidence outside the record, we affirm the judgment below.

A.

Some brief background is in order. A sentence must be procedurally reasonable. *United States v. Lynn*, 592 F.3d 572, 575 (4th Cir. 2010) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). We review a challenge to a sentence's procedural reasonableness by applying a "deferential abuse-of-discretion standard." *United States v. McCain*, 974 F.3d 506, 515 (4th Cir. 2020) (quoting *Gall*, 552 U.S. at 41). Under this standard, we must ensure that the district court did not commit a "significant procedural error." *Gall*, 552 U.S. at 51. It is a significant procedural error for a court to "select[] a sentence based on clearly erroneous facts." *Id.* Other significant procedural errors include failing to properly calculate the applicable Guidelines range, "failing to consider the § 3553(a) factors," and "failing to adequately explain the chosen sentence." *Id.* In explaining the sentence, the court must "place on the record an 'individualized assessment' based on the particular facts of the case before it." *United States v. Carter*, 564 F.3d 325, 330 (4th Cir. 2009) (quoting *Gall*, 552 U.S. at 50). If we find the district court abused its discretion by committing a

9

significant procedural error, we reverse for resentencing unless we conclude the error was harmless. *Lynn*, 592 F.3d at 576; *United States v. Hargrove*, 701 F.3d 156, 161 (4th Cir. 2012).

A district court may also not "impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." *Cunningham v. California*, 549 U.S. 270, 275 (2007) (citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Blakely v. Washington*, 542 U.S. 296 (2004); and *United States v. Booker*, 543 U.S. 220 (2005)). That said, a district court may *reference* information from outside the record at sentencing so long as the court does not *rely* on such extrinsic information in its sentencing determination. *See United States v. Thompson*, 864 F.3d 837, 842 (7th Cir. 2017); *United States v. Meyer*, 790 F.3d 781, 783 (8th Cir. 2015); *United States v. Lisenberry*, 866 F.3d 934, 937 (8th Cir. 2017) (per curiam). Indeed, the Guidelines state that, at sentencing, a "court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). A district court may also draw reasonable inferences from the facts in the record when formulating a sentence. *See, e.g., United States v. Parrish*, 915 F.3d 1043, 1048 (6th Cir. 2019); *United States v. Orozco-Acosta*, 607 F.3d 1156, 1166 (9th Cir. 2010); *United States v. Caldwell*, 448 F.3d 287, 290 (5th Cir. 2006).

With this background in mind, we analyze Roy's three claims in turn to determine whether the district court here relied on clearly erroneous facts or those outside the record in its sentencing determination.

B.

The district court did not abuse its discretion in its discussion of fentanyl's lethality during Roy's sentencing hearing. Contrary to Roy's contention, the court did not rest on clearly erroneous facts when it recounted a law enforcement officer's warning that fentanyl is dangerous to touch and when it stated that "[i]f you come in contact with it, it can kill you." J.A. 35. While the question of whether fentanyl is dangerous to touch is a matter of scientific debate, an answer in the affirmative was hardly so wrong as to constitute a "clearly erroneous fact[]" under *Gall*. 552 U.S. at 51.

In a 2017 statement about the dangers of fentanyl exposure, then DEA Acting Administrator Chuck Rosenberg stated that fentanyl "is extremely dangerous to users and to those who simply come into contact with it." DOJ, *Roll Call Video Warns About Dangers of Fentanyl Exposure*, YouTube (June 7, 2017). Administrator Rosenberg was unequivocal in his determination that "you can be in grave danger if you unintentionally come into contact with fentanyl." *Id.* He noted that fentanyl can be absorbed into the bloodstream through one's skin or mucous membranes, by touching one's mouth, nose, or eyes after exposure, or by breathing tiny amounts of airborne powder. The CDC's National Institute for Occupational Safety and Health (NIOSH), for its part, recommended that emergency responders in the presence of fentanyl wear respiratory protection and nitrile gloves. NIOSH, *Fentanyl: Emergency Responders at Risk* (Feb. 11, 2020). Referencing

11

reports from the CDC and other experts, a federal district court in West Virginia stated that "because fentanyl can be absorbed through the skin in some forms, fentanyl can be deadly if touched." *United States v. Walker*, 423 F. Supp. 3d 281, 285 n. 24 (S.D. W.Va. 2017).

On the other hand, reputable medical sources have disputed the position that fentanyl poses significant exposure risk to those who merely touch it. Wash. Dep't of Health, *Fentanyl Exposure in Public Places* (Nov. 16, 2023) ("You can't overdose just by touching fentanyl."); Liam Connolly, *Can Fentanyl Be Absorbed Through Your Skin*, U. Cal. Davis Health (Oct. 18, 2022) ("It is a common misconception that fentanyl can be absorbed through the skin, but it is not true for casual exposure.").

The particular fact in question is thus a matter of dispute. But contested facts are hardly the same as clearly erroneous ones. The scientific dispute here indicates that, while expert opinions may differ, the court's statements that fentanyl may be dangerous to the touch and can kill those who come into contact with it were not "clearly erroneous." *Gall*, 552 U.S. at 51.

While the particular fact of fentanyl's lethality to the touch may have been a matter of dispute, the district court's larger point was ever so true. Far from constituting significant procedural error, it was eminently reasonable for the district court to consider fentanyl's lethality and the devastating impact it has wrought upon communities across America. *See* 18 U.S.C. § 3553(a) (stating that a sentence must reflect the seriousness of the offense, provide just punishment for the offense, and afford adequate deterrence). The nation is in the midst of a shockingly severe fentanyl crisis. U.S. drug overdose deaths rose over 400 percent from 2001 to 2021, largely due to fentanyl's rise as the nation's most deadly drug.

*See* Merianne Rose Spencer et al., *Drug Overdose Deaths in the United States, 2001–2021*, Nat'l Ctr. for Health Stats. (Dec. 21, 2022). By 2021, over two-thirds of U.S. drug overdose deaths involved fentanyl and similar synthetic opioids, with these drugs causing nearly 23 times the number of overdose deaths in 2021 than they did in 2013. CDC, *Opioid Overdose* (Aug. 23, 2023). More than 109,000 people died from drug overdoses in the United States in 2022—the most ever in a single year. Farida B. Ahmad et al., *Provisional Drug Overdose Death Counts*, Nat'l Ctr. for Health Stats. (Nov. 15, 2023).

And that is not all. As the district court was well aware, the fentanyl crisis had been particularly devastating to its home state of West Virginia. Fatal drug overdoses in the State increased over 70 percent from 2019 to 2021, reaching 1516 deaths that year. W. Va. Dep't of Health and Hum. Res., *Drug Overdose Mortality* (Nov. 16, 2023). Fentanyl overdoses were responsible for most of this alarming increase. *See id.* Seventy-six percent of West Virginia overdose deaths in 2021 involved fentanyl, with fentanyl-involved deaths more than doubling since 2019. *Id.*

As § 3553(a) attests, sentencing has many facets. The very number of factors bearing upon the sentencing function affords trial courts latitude in discussing and applying their decisions. A trial court can be instructional. In fact, it can be beneficial for a defendant to hear straight from a judge why he is being punished and what he might do to turn his life around. *See Chavez-Meza v. United States*, 138 S. Ct. 1959, 1967 (2018). District courts are also permitted to give voice to the ills faced by the communities in which they sit. In this case, the court was well within its discretion to emphasize the dangerousness of fentanyl when ensuring that the sentence reflected the seriousness of the offense, provided

13

just punishment, and served as an adequate deterrent to future criminal conduct. *See* 18 U.S.C. § 3553(a). Our court has rightly required district courts to explain their sentencing decisions. *See, e.g.*, *Carter*, 564 F.3d at 330. This the trial court did here. It will not do for us to apply a myopic pick to explanations that we ourselves have rightly encouraged.

Finally, we are not persuaded that the district court even relied on the statements in question when fashioning Roy's sentence. When it recounted the "stories" it had heard from a law enforcement officer about the risks of touching fentanyl, the court stated they were "anecdotal" and clarified that it was referencing them in support of its larger and undisputed point regarding "the toxicity of fentanyl," namely, "how . . . fatal it is." J.A. 30. Viewing the transcript as a whole, it was this latter fact—the lethality of fentanyl—that informed the district court's decision to vary upwards from the Guidelines.

In sum, for all the reasons recounted, we find no procedural error in the statements discussed above.

## C.

Roy next claims that the district court's statements drawing a connection between the fentanyl offense and the firearm offense were erroneous and not based on the record because the two offenses occurred ten days apart and Roy did not have a firearm on him while driving the fentanyl to West Virginia. But the presentence report found that the two cases were "connected by a common criminal objective or constitut[ed] part of a common scheme or plan." J.A. 80.

A district court may "accept any undisputed portion of the presentence report as a finding of fact." Fed. R. Crim. P. 32(i)(3)(A). Because Roy, whether for strategic purposes

14

or other reasons, did not object to the presentence report when explicitly asked at the sentencing hearing, he conceded that the fentanyl offense and the firearm offense were "connected by a common criminal objective" or "constitut[ed] part of a common scheme or plan." J.A. 80. It was again within the court's discretion to "adopt the[se] findings . . . without more specific inquiry or explanation." *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990) (quoting *United States v. Mueller*, 902 F.2d 336, 346 (5th Cir. 1990)).

Viewed in this context, the district court's statements drawing a connection between the two offenses constituted a permissible reliance on facts within the record. Observing that the plea agreement stemmed from "two cases," the district court expressly adopted the findings of the presentence report and subsequently used them to connect "the amount of fentanyl that we are talking about and the presence of the firearm." J.A. 47. The district court did not clearly err in drawing this connection.

### D.

Roy also takes issue with the district court's having referenced the presence of "firearms" when Roy pleaded guilty to possessing only a single firearm. This was at most a harmless error. The district court exhibited a detailed understanding of the facts of the case throughout the 75-minute-long sentencing hearing. The court correctly stated that Roy had pleaded guilty to a single drug offense and a single offense of unlawful possession of a firearm, and it never claimed that the firearm offense involved more than one firearm or that the fentanyl offense involved any firearms. Near the beginning of the hearing, the court noted that Roy agreed to "forfeit all property encompassed in the forfeiture allegation . . . [i]n particular . . . a Strassell's Machine, Inc., (Hi-Point) Colt pistol." J.A. 21. The court

15

then confirmed with the government that there was no further contraband for Roy to forfeit other than the ammunition found alongside the pistol. The totality of the circumstances thus shows that the court's passing references to "firearms" did not alter its understanding that Roy had possessed a single firearm.

What's more, any error caused by the references to "firearms" was harmless because the court did not rely on these references to increase Roy's sentence. *See United States v. Robinson*, 460 F.3d 550, 557 (4th Cir. 2006); Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). Nothing in the court's detailed explanation for its upward variance suggests that the sentence was influenced by a mistaken belief about the number of firearms involved.

## IV.

For the foregoing reasons, the judgment of the district court is in all respects affirmed.

*AFFIRMED*