**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 22-4595**

───────────────

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

  v.

JASON STEVEN KOKINDA,

     Defendant - Appellant.

───────────────

On Remand from the Supreme Court of the United States. (S. Ct. No. 24-5006)

───────────────

Submitted:  March 6, 2025        Decided:  July 28, 2025

───────────────

Before AGEE, THACKER, and RUSHING, Circuit Judges.

───────────────

Affirmed by published opinion.  Judge Thacker wrote the opinion in which Judge Agee and Judge Rushing joined.

───────────────

**ON BRIEF:**  David W. Frame, LAW OFFICE OF DAVID W. FRAME, Clarksburg, West Virginia, for Appellant.  William Ihlenfeld, United States Attorney, Randolph J. Bernard, Acting United States Attorney, Wheeling, West Virginia, Eleanor F. Hurney, Assistant United States Attorney, Martinsburg, West Virginia, Brandon S. Flower, Assistant United States Attorney, Sarah E. Wagner, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Clarksburg, West Virginia, for Appellee.

───────────────

THACKER, Circuit Judge:

Jason Steven Kokinda ("Appellant"), a convicted sex offender required to register pursuant to the Sex Offender Registration and Notification Act ("SORNA"), attempted to evade his registration requirements while staying at campgrounds in West Virginia.

A federal grand jury indicted Appellant on one count of traveling in interstate commerce and knowingly failing to update his registration as a sex offender in violation of 18 U.S.C. § 2250. The case proceeded to trial and Appellant stipulated that his prior sex offense required him to register. But Appellant argued that, by staying mobile without a fixed abode, SORNA did not require him to register anywhere. When the district court instructed the jury on SORNA's definition of "resides," it supplemented the term "habitually lives" with guidance from The National Guidelines for Sex Offender Registration and Notification ("SMART Guidelines"). After the jury found Appellant guilty, he moved for judgment of acquittal or a new trial, arguing that the district court's jury instruction improperly expanded SORNA's definition of "resides." The district court denied the motion.

Appellant makes the same argument on appeal -- that the district court's jury instruction was an incorrect recitation of the law. He also argues that SORNA, as applied to him, violates the Tenth Amendment. And Appellant challenges two facets of his sentence: (1) the eight-level enhancement for his third degree sexual abuse of a minor and possession of child pornography and (2) his lifetime term of supervised release.

We previously concluded that the district court correctly instructed the jury on what the terms "resides" and "habitually lives" mean for purposes of SORNA. *United States v.*

2

*Kokinda*, 93 F.4th 635 (4th Cir. 2024), *vacated*, 145 S. Ct. 124 (2024). In making this determination, we deferred to the SMART Guidelines pursuant to *Chevron*.[1] We also concluded that SORNA, as applied to Appellant, does not violate the Tenth Amendment. And we affirmed the district court's sentence as it was procedurally and substantively reasonable. After we issued our prior opinion in this case, the Supreme Court of the United States decided *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), and overturned *Chevron*. The Court then vacated our prior opinion in this case and remanded for reconsideration in light of *Loper Bright*.

Upon reconsideration, we conclude that although *Loper Bright* changes the analysis, it does not alter the result here. *Loper Bright* impacts our analysis only on the question of whether the district court properly instructed the jury as to the meaning of the terms "resides" and "habitually lives." While the SMART Guidelines are no longer entitled to *Chevron* deference, they are nonetheless persuasive, and we conclude that they provide an accurate construction of the law. Therefore, we hold that the district court did not err in relying on the SMART Guidelines' definitions of "resides" and "habitually lives" in instructing the jury. We also continue to hold that SORNA, as applied to Appellant, does not violate the Tenth Amendment, and that Appellant's sentence was both procedurally and substantively reasonable.

---

[1] *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) (requiring courts to defer to an agency's interpretation of an ambiguous statute if that interpretation was based on a permissible construction of the statute).

3

I.

A.

In 2007, Appellant was arrested in New Jersey and charged with one count of endangering the welfare of a child and one count of distribution of child pornography. He pled guilty to both charges in 2009 and was sentenced to three years of imprisonment. Following his New Jersey sentence, Appellant served a separate Pennsylvania sentence for unlawful contact with a minor. Based on the New Jersey child pornography conviction, Appellant was required to register as a sex offender pursuant to SORNA. *See* 34 U.S.C. § 20913; 18 U.S.C. § 2250(a). Appellant was registered in Delaware in 2015, Vermont in 2016, and New York in 2017. In 2018, Appellant left the country without notification and was later deported from Israel back to the United States based on a Vermont arrest warrant. He was released on bond in February 2019 and remained unregistered throughout 2019. While unregistered, Appellant traveled to several states in the Northeast and Midwest, evading detection by law enforcement.

That evasion ended on September 28, 2019, when Rosanna Bell ("Bell") called the police on Appellant. Bell observed Appellant talking to two pre-teen girls on the swings at the city park in Elkins, West Virginia. Then, Bell saw Appellant grab the buttocks of one of the girls while pushing her on the swing. Bell approached the girls and asked if they knew Appellant. P.M. -- the girl whom Appellant had grabbed -- asked if Bell "could please make [Appellant] leave." J.A. 599.[2] Bell called the police and waited with the girls

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

until law enforcement arrived.  By the time law enforcement officers arrived, Appellant had left the park.  The next day, officers noticed a man near the park matching Appellant's description and approached him.  When asked his identity, Appellant gave the name "Representative Jason Stevens." *Id.* at 122.  Officers arrested him and charged him with sexual abuse in the third degree in violation of W. Va. Code § 61-8B-9 (2019).[3]

During the month prior to his arrest, Appellant left a paper trail of his stay in West Virginia.  Financial records placed Appellant shopping in and near Elkins, West Virginia on an almost daily basis from August 24 until September 27.  And receipts and witnesses established that Appellant rented two different campsites in West Virginia for most of September.  At one of those campsites, Appellant used the alias "Jason Smoke." J.A. 183. Additionally, an Elkins, West Virginia YMCA employee provided records demonstrating that a "Jason Stevens" purchased day passes on five occasions between September 10 and 24. *Id.* at 201.  Only four of Appellant's transactions during the August 24 to September 27 time period occurred outside West Virginia, indicating brief visits to Winchester, Virginia, and Erie, Pennsylvania.  The Winchester trip occurred on September 17, with Appellant making a purchase back in Elkins, West Virginia later that same day.  And the Erie trip included transactions on September 23, with a transaction back in Elkins the following day.  Appellant did not dispute these transactions when he testified at trial.

---

[3] "A person is guilty of sexual abuse in the third degree when he subjects another person to sexual contact without the latter's consent, when such lack of consent is due to incapacity to consent by reason of being less than sixteen years old."  W. Va. Code § 61-8B-9.

When Appellant was arrested, his two cell phones were seized. Later examination of one of the cell phones revealed thirty images depicting child pornography, along with a PDF file containing child pornography search terms such as "My little girl nude," "Kiddy CP," and "Preteen incest." J.A. 653. The cell phone also contained indicia of Appellant's ownership and use of the phone, including photographs of himself, his passport, and documents and receipts containing his name.

B.

Appellant was indicted by a federal grand jury on one count of failing to register as a sex offender, in violation of 18 U.S.C. § 2250(a). The case proceeded to trial. Appellant stipulated that his New Jersey conviction required him to register as a sex offender pursuant to SORNA. But Appellant argued that he never "resided" in West Virginia, so SORNA's registration requirement was not triggered.

1.

At trial, Appellant testified in his own defense. He admitted that he had not registered as a sex offender in West Virginia, or any state after leaving Vermont in February 2019. But he denied that he had a home or regularly lived in West Virginia during the month preceding his arrest. Appellant explained that he "fully studied" SORNA's registration requirements and "tried to move around as much as possible" so he would not need to register. J.A. 441–42. And he admitted frequenting Elkins from August 24 to September 19, to go to the gym, to shop, and to charge his laptop at the library and city park. But he asserted that he was "staying somewhere very far away, as [his] home base of operations, [as his] constructive type of temporary lodging." *Id.* at 459. And he

6

explained that he used false identities to conceal the fact that he is a sex offender, and stayed in campgrounds that did not require an identification.

2.

SORNA requires sex offenders to register "and keep the registration current, in each jurisdiction where the offender resides." 34 U.S.C. § 20913. "Resides" is defined as "the location of the individual's home or other place where the individual habitually lives." *Id.* § 20911(13). As discussed below, the SMART Guidelines define SORNA's term "habitually lives." 73 Fed. Reg. 38,030, 38,061 (July 2, 2008).

Both Appellant and the United States proposed jury instructions to clarify SORNA's registration requirement. Appellant's proposed instruction included SORNA's definition of "resides" along with a portion of the SMART Guidelines' definition of "habitually lives." Specifically, Appellant's instruction defined "habitually lives" to "include[] places in which the sex offender lives with some regularity. A sex offender habitually lives in the relevant sense in any place in which the sex offender lives for at least 30 days." S.A. 5.[4] The United States' proposed instruction also included SORNA's definition of "resides," but included a longer excerpt from the SMART Guidelines defining "habitually lives." That longer excerpt stated:

> "Habitually lives" accordingly should be understood to include places in which the sex offender lives with some regularity, and with reference to where the sex offender actually lives, not just in terms of what he would choose to characterize as his home address or place of residence for self-interested reasons. The specific interpretation of this element of "residence" these

---

[4] S.A. refers to the Supplemental Appendix filed by the United States in this appeal.

7

Guidelines adopt is that a sex offender habitually lives in the relevant sense in any place in which the sex offender lives for at least 30 days. Hence, a sex offender resides in a jurisdiction for the purposes of SORNA if the sex offender has a home in the jurisdiction, or if the sex offender lives in the jurisdiction for at least 30 days. Jurisdictions may specify in the manner of their choosing the application of the 30-day standard to sex offenders whose presence in the jurisdiction for 30 days is intermittent but who live in the jurisdiction for 30 days in the aggregate over some longer period of time.

S.A. 27.

The district court declined to give either party's proposed instruction in total, opting to give an instruction incorporating SORNA's definition of "resides" and the SMART Guidelines' definition of "habitually lives":

[T]he place where a person "resides" is the location of an individual's home or other place where the individual habitually lives. "Habitually lives" includes places in which the sex offender lives with some regularity. "Habitually lives," accordingly, should be understood to include where the sex offender actually lives, not just in terms of what he would choose to characterize as his home address or place of residence for self-interested reasons. The specific interpretation of this element of "residence" is that a sex offender habitually lives in the relevant sense in any place in which the offender lives for at least 30 days. Hence, a sex offender resides in a jurisdiction for the purposes of SORNA, if the sex offender has a home in the jurisdiction, or if the sex offender lives in the jurisdiction for at least 30 days. As to the timing of registration, based on changes of residence, the understanding of "habitually lives" to mean living in a place for at least 30 days does not mean that the registration of a sex offender who enters a jurisdiction to reside may be delayed until after he has lived in the jurisdiction for 30 days. Rather, a sex offender who enters a jurisdiction, in order to make his home or habitually live in the jurisdiction, is required to register within three business days.

8

> A sex offender who lacks a fixed abode or permanent residence is still required to register in the jurisdiction in which they reside. Such a sex offender cannot provide the residence address required because they have no definitive address at which they live. Even a transient or homeless sex offender is still required to provide a description of the place they habitually live. Some more or less specific description should normally be attainable concerning the place or places where such a sex offender habitually lives, including where the sex offender might station himself during the day or sleep at night.

J.A. 512–13.  After deliberations, the jury rendered a guilty verdict.

Appellant filed a pro se motion for judgment of acquittal or a new trial, arguing that the district court's jury instruction "broaden[ed] the scope of [the] 'resides' element beyond its ordinary English usage by using the guidelines to override the limits imposed by the statutory text."  Pro Se Mot. for Acquittal at 15, *United States v. Kokinda*, No. 2:21-cr-00020 (N.D. W. Va. Sept. 8, 2021; filed Nov. 8, 2021) ECF 70-1.  The district court denied the motion, noting that the SMART Guidelines had the force and effect of law and explaining that the jury instruction correctly stated the law and did not confuse or mislead the jury.

### 3.

In advance of sentencing, the probation officer prepared a Presentence Investigation Report ("PSR").  The PSR identified two bases for imposing an eight-level enhancement for committing a sex offense against a minor while in a failure to register status pursuant to section 2A3.5(b)(1)(C) of the United States Sentencing Guidelines (the "Guidelines").  *See* U.S.S.G. § 2A3.5(b)(1)(C) (2018).  The first basis was Appellant's third degree sexual abuse of P.M. when he grabbed her buttocks at the city park in Elkins.  The second basis

was Appellant's possession of child pornography on his cell phone. The United States called witnesses at the sentencing hearing to support both bases.

First, Bell testified about the specifics of what she saw at the park when she called the police. She explained that she saw Appellant put his hands on P.M.'s rear end and squeeze her buttocks while pushing her on the swing. Bell also relayed that P.M. told her that Appellant had offered her money if she showered while Appellant filmed her. The United States also admitted P.M.'s written statement, which verified that Appellant had touched her buttocks while pushing her on the swing. P.M.'s statement confirmed that Appellant "kept asking [P.M.] and [the other girl] if he could get in the shower with [them] when no one was home." J.A. 614. The statement also indicated that Appellant had communicated with P.M. on social media to ask for nude images.

Second, Police Chief Joseph Corkrean testified that he extracted data from Appellant's phone. Because the phone was broken, Chief Corkrean extracted the raw data from the phone's internal chip. This form of data extraction did not retrieve the metadata from the files, which would have revealed when the files were downloaded and accessed, but the files themselves could be analyzed. Then, Gary Weaver, an FBI Crimes Against Children Task Force Officer, testified that he reviewed the extracted data and identified thirty images that depicted prepubescent females with their genitalia fully exposed. Officer Weaver compared the images to the images that supported Appellant's New Jersey child pornography conviction and testified that they were similar. Officer Weaver also located a file on Appellant's phone that was created during the period Appellant owned the phone that contained search terms relating to child pornography.

10

Appellant objected to the eight-level sentencing enhancement, arguing that he did not grab P.M.'s buttocks at the park in Elkins and that he did not knowingly possess child pornography on his cell phone. Regarding the child pornography, Appellant argued that because the photographs lacked metadata, the United States could not prove Appellant was the one to download the images on his phone.

The district court overruled Appellant's objection to the eight-level sentencing enhancement pursuant to Guidelines section 2A3.5(b)(1)(c). The court found by a preponderance of the evidence that Appellant committed third degree sexual abuse against a minor while in failure to register status, which supported the enhancement. Additionally, the court found that Appellant possessed child pornography, which it explained was a separate and independent basis for the enhancement. Application of the enhancement resulted in a Guidelines sentencing range of 51 to 63 months. The district court sentenced Appellant to 63 months of imprisonment to be followed by lifetime supervised release. The court emphasized that the lifetime term of supervised release was appropriate in order to protect the community, considering Appellant's history of sex offenses and evasion of SORNA's registration requirement.

## II.

"We review a district court's decision to give a particular jury instruction for abuse of discretion, and review whether a jury instruction incorrectly stated the law de novo." *United States v. Hassler*, 992 F.3d 243, 246 (4th Cir. 2021) (quoting *United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018)). "In reviewing the adequacy of jury instructions, we determine whether the instructions construed as a whole, and in light of the whole

record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Hassler*, 992 F.3d at 246 (quoting *United States v. Kivanc*, 714 F.3d 782, 794 (4th Cir. 2013)). Even if a jury was erroneously instructed, we will not set aside a resulting verdict unless the erroneous instruction seriously prejudiced the challenging party's case. *Hassler*, 992 F.3d at 246 (quoting *Miltier*, 882 F.3d at 89).

Generally, we review constitutional claims de novo. *United States v. Claybrooks*, 90 F.4th 248, 255 (4th Cir. 2024). But unpreserved constitutional claims are reviewed for plain error. *United States v. Hager*, 721 F.3d 167, 182 (4th Cir. 2013).

After *United States v. Booker*, 543 U.S. 220 (2005), we review a sentence for reasonableness, whether inside, just outside, or significantly outside the Guidelines range, and we apply a "deferential abuse-of-discretion standard." *United States v. Roy*, 88 F.4th 525, 530 (4th Cir. 2023) (quoting *United States v. McCain*, 974 F.3d 506, 515 (4th Cir. 2020)). We first must "ensure that the district court did not commit a 'significant procedural error.'" *Roy*, 88 F.4th at 530 (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). Only if the sentence is procedurally reasonable can we evaluate the substantive reasonableness of the sentence, again using the abuse of discretion standard of review. *Gall*, 552 U.S. at 51.

III.

Appellant raises four issues on appeal. First, he argues that the district court erred in instructing the jury on the definition of "habitually lives," which he alleges expanded the definition of "resides." Second, Appellant argues that SORNA, as applied to him, violates the Tenth Amendment to the United States Constitution. Third, he argues the district court erred in imposing the eight-level sentencing enhancement, which he alleges was not supported by either third degree sexual abuse of a minor or possession of child pornography. And fourth, Appellant argues that the district court erred in imposing lifetime supervised release.

A.

Jury Instruction

Appellant initially raised two arguments to challenge the district court's jury instruction. First, he argued that after the Supreme Court's decision in *Nichols v. United States*, 578 U.S. 104 (2016), SORNA's registration requirement does not apply to transient sex offenders who have no fixed abode. Second, he argued that the SMART Guidelines should not be afforded *Chevron* deference because neither "resides" nor "habitually lives" is ambiguous and even if they were, *Chevron* deference should not apply in criminal contexts. In his supplemental brief following *Loper Bright*, Appellant changes course and argues that the terms "resides" and "habitually lives" are, in fact, ambiguous. And because he considers them to be ambiguous, Appellant now argues that the rule of lenity should apply, such that we should construe the criminal statute in his favor. We conclude that the district court's jury instruction, which relied on the SMART Guidelines' definitions of

13

"resides" and "habitually lives," was a correct statement of the law and that the rule of lenity is inapplicable. We also conclude that Appellant's proposed construction of SORNA is contrary to its purpose. Therefore, the jury instruction was proper.

1.

We begin with an overview of SORNA's registration requirement. In 2006, Congress enacted SORNA as part of the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587. Among its civil provisions, SORNA requires sex offenders to register "and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student." 34 U.S.C. § 20913.[5] SORNA also establishes a federal criminal offense covering any person who (1) "is required to register under [SORNA];" (2) "travels in interstate or foreign commerce;" and (3) "knowingly fails to register or update a registration." Adam Walsh Child Protection and Safety Act of 2006 § 141, 120 Stat. at 601–02 (codified at 18 U.S.C. § 2251(a)).

SORNA defines "resides" to mean "the location of the individual's home or other place where the individual habitually lives." 34 U.S.C. § 20911(13). To keep the registration current, "[a] sex offender shall, not later than 3 business days after each change of . . . residence, . . . appear in person in at least 1 jurisdiction . . . and inform that jurisdiction of all changes in the information required for that offender in the sex offender

---

[5] 34 U.S.C. § 20913 was formerly codified at 42 U.S.C. § 16913. Its language did not change when it was recodified.

registry." *Id.* § 20913(c).   That information includes the "address of each residence at which the sex offender resides or will reside." *Id.* § 20914(a)(3).

Congress specifically authorized the Attorney General to "issue guidelines and regulations to interpret and implement" SORNA.  34 U.S.C. § 20912(b).  Pursuant to that delegation of authority, the Attorney General issued the SMART Guidelines.  73 Fed. Reg. 38,030 (July 2, 2008).  Section VIII of the SMART Guidelines recognizes that "[r]equiring registration only where a sex offender has a residence or home in the sense of a fixed abode would be too narrow to achieve SORNA's objective of 'comprehensive' registration of sex offenders, . . . because some sex offenders have no fixed abodes."  *Id.* at 38,061.  The section then explains that, pursuant to SORNA, a sex offender must register "[i]n any jurisdiction in which he has his home; and [i]n any jurisdiction in which he habitually lives (even if he has no home or fixed address in the jurisdiction, or no home anywhere)."  *Id.* at 38,061.

Section VIII also addresses the meaning of "habitually lives."  It explains that the term "is not self-explanatory and requires further definition" and that an "overly narrow definition would undermine the objectives of sex offender registration and notification under SORNA."  73 Fed. Reg. at 38,061.  Therefore, per the SMART Guidelines, the term "should be understood to include places in which the sex offender lives with some regularity, and with reference to where the sex offender actually lives, not just in terms of what he would choose to characterize as his home address or place of residence for self-interested reasons."  *Id.* at 38,062.  Ultimately, the SMART Guidelines define "resides" to mean where "a sex offender habitually lives in the relevant sense . . . for at least 30 days."

15

*Id.* And when sex offenders register, those "who lack fixed abodes are nevertheless required to register in the jurisdictions in which they reside" and provide "some more or less specific description . . . concerning the place or places where such a sex offender habitually lives—e.g., information about a certain part of a city that is the sex offender's habitual locale, a park or spot on the street (or number of such places) where the sex offender stations himself during the day or sleeps at night." *Id.* at 38,055.

2.

Appellant argues that the SMART Guidelines' definitions of "resides" and "habitually lives" -- and, therefore, the district court's jury instruction -- conflict with *Nichols v. United States*, 578 U.S. 104. In *Nichols*, the Supreme Court analyzed whether a sex offender, Nichols, needed to update his registration in Kansas before he moved to the Philippines. 578 U.S. at 105. *Nichols* clarified that sex offenders who moved out of the country were not required to notify the jurisdiction they had left after they changed their residence. *Id.* at 110. The Court explained that SORNA "requires a sex offender who changes his residence to appear, within three business days of the change, in person in at least one jurisdiction (but not a foreign country) where he resides, works, or studies, and to inform that jurisdiction of the address change." *Id.* at 109. But SORNA "uses only the present tense [of] 'resides,'" meaning that once Nichols moved to the Philippines, "he was no longer required to appear in person in Kansas to update his registration." *Id.*

Appellant argues that *Nichols* held that a sex offender may depart from a jurisdiction where he was previously registered, without being required to "update" or "de-register" and that he may not need to register somewhere else because he does not "reside" anywhere

16

yet. Appellant relies on a hypothetical from *Nichols* wherein the Court opined, "[W]hat if [a sex offender] were to move from Kansas to California and spend several nights in hotels along the way? Such ponderings cannot be the basis for imposing criminal punishment." *Id.* at 111. Appellant would have us extend that hypothetical to hold that sex offenders can travel indefinitely to evade registration requirements, never reaching the hypothetical's California. We decline the invitation to construe *Nichols*' hypothetical so broadly. Appellant's interpretation is at odds with the reasoning in *Nichols* as well as the purpose of SORNA. Instead, the hypothetical underscores that the act of leaving a residence does not count as a change of residence. "Nichols changed his residence just once: from Kansas to the Philippines." *Id.* Similarly, here, Appellant's course of conduct for the month before his arrest indicates that he changed his residence just once -- from Vermont to West Virginia.

Thus, we reject Appellant's argument that the SMART Guidelines conflict with *Nichols*.

### 3.

Next, Appellant argues that the district court erred in relying on the SMART Guidelines and that, because the terms "reside" and "habitually live" are ambiguous, the rule of lenity compels us to construe the statute in his favor. Prior to *Loper Bright Enterprises v. Raimondo*, we considered whether the SMART Guidelines were entitled to *Chevron* deference. 603 U.S. 369 (2024). But, as noted above, *Loper Bright* changed the landscape. Now, the Supreme Court has made clear that "courts, not agencies, will decide all relevant questions of law . . . and set aside any [agency] action inconsistent with the law

17

as they interpret it." *Id.* at 392 (cleaned up).  Nevertheless, the Court also recognized that "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court . . . is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at 395.  Courts "fulfill[] that role by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* (cleaned up).

As we have explained, Congress specifically left the term "habitually lives" undefined and delegated the Attorney General specific authority to promulgate regulations for the interpretation and implementation of SORNA.  34 U.S.C. § 20912(b); *see United States v. Bridges*, 741 F.3d 464, 468 n.5 (4th Cir. 2014) ("By leaving the operative statutory term undefined and delegating broad rulemaking authority to the Attorney General, Congress has implicitly left a gap in SORNA's statutory scheme that the Attorney General may fill." (citing *Chevron*, 467 U.S. at 843)).  In exercising that specifically delegated authority, the Attorney General acknowledged that "SORNA's objective [was the] 'comprehensive' registration of sex offenders, . . . because some sex offenders have no fixed abodes."  73 Fed. Reg. at 38,061.  With that in mind, the Attorney General explained that an "overly narrow definition [of 'habitually lives'] would undermine the objectives of sex offender registration and notification under SORNA."  *Id.* at 38,061.  Thus, as we have explained, the SMART Guidelines defined "habitually lives" to include more than simply a fixed abode.  Instead, pursuant to the SMART Guidelines, the term should "be understood to include places in which the sex offender lives with some regularity, and with reference

18

to where the sex offender actually lives, not just in terms of what he would choose to characterize as his home address or place of residence for self-interested reasons." *Id.* at 38,062.

We think this interpretation of the term "habitually lives" evidences reasoned decision making on the part of the Attorney General and is a reasonable exercise of Congress's specific delegation of authority. In enacting SORNA, "Congress noted that the earlier federal efforts to create sex offender registries state-by-state had left gaps in the system, resulting in an estimated 100,000 unaccounted for sex offenders." *United States v. Under Seal*, 709 F.3d 257, 263 (4th Cir. 2013) (citing H.R.Rep. No. 109–218, pt. 1, at 14 (2005), 2005 WL 2210642). "With SORNA, Congress sought to fill those gaps and put in place a national sex offender registration system for the protection of the public." *Id.* Taking into account SORNA's broad purpose, we conclude that the SMART Guidelines retain the power to persuade and provide useful guidance on the correct definition of "habitually lives." *See Loper Bright*, 603 U.S. at 388 (explaining that the extent to which a court may look to an agency for guidance depends upon "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade"). Because we conclude that the SMART Guidelines provide the proper definition of the term habitually lives, we conclude that the district court's jury instruction which relied on them was a correct statement of law.

Further, we reject Appellant's invitation to apply the rule of lenity to the issue before us. "That rule applies only when a criminal statute contains a grievous ambiguity or

19

uncertainty, and only if, after seizing everything from which aid can be derived, the Court can make no more than a guess as to what Congress intended." *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (cleaned up). As we have consistently recognized, "SORNA is a non-punitive, civil regulatory scheme, both in purpose and effect." *Under Seal*, 709 at 263. The SMART Guidelines provide a clear and reasonable interpretation of that civil statute by clarifying that "habitually lives" includes where the sex offender actually lives -- such as the place he "stations himself during the day or sleeps at night" -- not just where he could characterize his place of residence for self-interested reasons. 73 Fed. Reg at 38,055.

While it is true that Congress enacted criminal penalties for violating SORNA, that criminal statute is not ambiguous. It provides that "whoever is required to register under [SORNA]" and, inter alia, "knowingly fails to register or update a registration as required" is guilty of a crime. 18 U.S.C. § 2250. Thus, there is no ambiguity that requires lenity in SORNA's criminal penalty statute. And even considering SORNA's civil provisions, including the registration requirement, we are not left with the determination that there is any "grievous ambiguity" after considering "everything from which aid can be derived," including SORNA's legislative history and the SMART Guidelines. *Ocasio*, 578 U.S. at 295 n.8.

### 4.

Thus, we are satisfied that the jury instructions, "construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Hassler*, 992 F.3d

20

at 246  (quoting *United States v. Kivanc*, 714 F.3d 782, 794 (4th Cir. 2013)).  Therefore, the district court did not err when it used the SMART Guidelines in fashioning its jury instructions.

B.

Tenth Amendment

Appellant argues that SORNA, as applied to him, violates the Tenth Amendment. He raises two arguments.  First, Appellant asserts that SORNA's registration requirement conflicts with West Virginia's Sex Offender Registry Act, which he argues did not require him to register in the state.  Next, Appellant argues that SORNA would commandeer West Virginia officers to register sex offenders, like himself, contrary to state law.  These arguments are foreclosed by our precedent.

In *Kennedy v. Allera*, we addressed whether SORNA violates the Tenth Amendment.  612 F.3d 261, 268 (4th Cir. 2010).  Appellant's arguments largely mirror those we rejected in *Kennedy*.  His first argument -- that conflicting federal and state registration requirements violate the Tenth Amendment -- "rests on the faulty premise that only those who are *required* to register are lawfully *able* to register."  *Id.*  And like the offender in *Kennedy*, Appellant cannot cite a provision of West Virginia law that prohibits him from registering.  *See id.*  Instead, West Virginia law required Appellant to register after visiting the state "for a period of more than fifteen continuous days" or once he changed his residence to West Virginia.  *See* W. Va. Code § 15-12-9(b)(2), (c).

*Kennedy* also forecloses Appellant's second argument, that SORNA commandeers state officers to register offenders contrary to state law.  In *Kennedy*, we held that SORNA

21

does not "*require* that the States comply with its directives. Rather, SORNA gives the States a choice, indicating that 'a jurisdiction that fails . . . to substantially implement [SORNA] shall not receive 10 percent of the funds that would otherwise be allocated.'" 612 F.3d at 269 at 269 (alterations in original) (quoting 34 U.S.C. § 20913(a)). And in *Kennedy*, we further noted that even if a defendant could "demonstrate facts or circumstances raising the specter of an unconstitutional commandeering, it would be the State, not [the defendant], that would be aggrieved" and a defendant "undoubtedly would face a serious standing question." 612 F.3d at 269. Appellant does not address this pitfall in his argument, and we find no reason to depart from our binding precedent in *Kennedy*.

C.

Sentencing Enhancement

Appellant argues that the district court erred in imposing an eight-level sentencing enhancement to his base offense level for commission of a sex offense against a minor while in failure to register status. *See* U.S.S.G. § 2A3.5(b)(1)(C) (2018). The Guidelines incorporate the definition of "sex offense" found in 34 U.S.C. § 20911(5), which defines "sex offense" as "a criminal offense that has an element involving a sexual act or sexual contact with another." *Id.* § 2A3.5 cmt. n.1; 34 U.S.C. § 20911(5). And "sex offense" also includes "a criminal offense that is a specified offense," which is defined to include "possession, production, or distribution of child pornography." 34 U.S.C. § 20911(5), (7)(G).

The district court determined that Appellant committed two offenses while unregistered: commission of third degree sexual abuse against P.M. and possession of child

22

pornography; both of which provided independent bases for the application of the eight-level sentencing enhancement. Appellant challenges both grounds.

1.

Appellant first argues that the district court erred in imposing the eight-level sentencing enhancement for committing sexual abuse in the third degree against P.M. He argues that the district court should not have believed Bell's testimony and that even if Bell should be believed, the touching of P.M.'s buttocks was not for Appellant's sexual gratification.

For a defendant to qualify for the enhancement, the Guidelines only require commission of a sex offense, not a conviction. *United States v. Lott*, 750 F.3d 214, 220–21 (2d Cir. 2014). And the United States bears the burden of proving, by the preponderance of the evidence, that a sex offense was committed. *United States v. Shivers*, 56 F.4th 320, 325 (4th Cir. 2022). Sexual abuse in the third degree is defined as subjecting a person who is less than sixteen years old to sexual contact without their consent. W. Va. Code § 61-8B-9. "Sexual contact" includes touching, either directly or through clothing, of the buttocks of another person, where the touching is done to gratify the sexual desire of either party. *Id.* § 61-8B-1(6).

At sentencing, the district court may consider sufficiently reliable information, and its determination that evidence is sufficiently reliable is reviewed for an abuse of discretion. *United States v. Pineda*, 770 F.3d 313, 318 (4th Cir. 2014). Its factual findings are reviewed for clear error. *Id.* The district court found Bell to be credible after she testified that she saw Appellant grab P.M.'s buttocks while pushing her on the swing. And Bell's

23

testimony was consistent with P.M.'s own statement that she gave to police officers the day of the incident. Although Appellant argues that Bell was not reliable, he does not argue that P.M. was not credible. And nothing in the record suggests that the district court's credibility determinations were erroneous.

Appellant also argues that touching P.M. was not for his "sexual gratification." *See* W. Va. Code § 61-8B-1(6) (defining "sexual contact" to require the touching be done to gratify the sexual desire of either party). In context, the record is clear that Appellant touching P.M. was intended for his sexual gratification. The record demonstrates that Appellant frequented the Elkins playground, befriended underage girls, asked to shower with P.M. and her friend while he filmed, and messaged P.M. on social media asking for nude images. Thus, the district court did not abuse its discretion by imposing the eight-level enhancement for this offense.

2.

Next, Appellant argues that testimony at sentencing did not establish that he knowingly possessed child pornography on his phone. He argues that because metadata of the child pornography files could not be gathered and he bought the phone from someone else, it remains unknown when the files were downloaded, accessed, and viewed and therefore whether he was the one to download, access, or view them.

To prove the knowledge element of a violation of 18 U.S.C. § 2252A, a defendant must have knowledge of "the sexually explicit nature of the materials as well as . . . the involvement of minors in the materials' production." *United States v. Miltier*, 882 F.3d 81, 86 (4th Cir. 2018) (quoting *United States v. Matthews*, 209 F.3d 338, 351 (4th Cir. 2000)).

24

Officer Weaver testified at sentencing that the photographs retrieved from Appellant's phone depicted minors engaged in sexually explicit conduct, *i.e.,* lascivious exhibition of the genitals. And to prove Appellant knowingly possessed the photographs, Officer Weaver testified that the phone was Appellant's, the photographs were similar to the child pornography in Appellant's prior New Jersey child pornography conviction, and there was a file on Appellant's phone -- created on a date Appellant owned the phone -- containing child pornography search terms such as "My little girl nude," "Kiddy CP," and "Preteen incest." J.A. 653. Based on this record, we conclude the district court did not clearly err when it concluded that Appellant knowingly possessed child pornography in violation of 18 U.S.C. § 2252A.

D.

Lifetime Supervised Release

Appellant's final argument is that his lifetime term of supervised release is both procedurally and substantively unreasonable. But Appellant merely states in a conclusory fashion that lifetime supervision is not reasonably related to the sentencing factors set forth in 18 U.S.C. § 3553(a), involves a greater deprivation of liberty than is reasonably necessary for the purposes set forth in § 3553, and conflicts with any pertinent policy statements issued by the Sentencing Commission.

In support of the imposition of lifetime supervised release, the district court focused on the need to protect the community and Appellant's general belief that he was "above the law." J.A. 802. The court specifically explained that it "believed that the lifetime term of supervised [release] . . . is the appropriate manner in which to ensure the protection of

25

the community in this case without constituting excessive punishment." *Id.* at 807.  The record amply demonstrates that Appellant repeatedly and intentionally evaded registering as a sex offender, violated conditions of pretrial release, and continued to victimize children.  Therefore, we have no trouble affirming lifetime supervised release in this case.

IV.

For these reasons, the judgment of the district court is

*AFFIRMED*.